1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Herve Holemen,<br>Petitioner<br>-vs-<br>Charles L. Ryan,<br>Respondent. | CV-12-2350-PHX-SRB (JFM)<br><br>**Report & Recommendation On Petition**<br>**For Writ Of Habeas Corpus** |

## I. MATTER UNDER CONSIDERATION

Petitioner, incarcerated at the time in the Arizona State Prison Complex at Yuma, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 1, 2012 (Doc. 1).  On March 18, 2013 Respondents filed their Response ("Answer") (Doc. 10).  Petitioner filed a Reply on April 16, 2013 (Doc. 11).

The Petitioner's Petition is now ripe for consideration.  Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND AND PROCEEDINGS AT TRIAL

Petitioner was arrested in connection with the investigation of two home invasion robberies that occurred approximately fifteen minutes apart in the same neighborhood. Petitioner was identified as the perpetrator in a show-up identification that night, and a photo lineup the next morning.  Police recovered property taken in the first robbery, a wallet and vitamins, from the inside of Defendant's vehicle which was found parked

1

1  down the street from the second robbery.  (Exhibit AA, Mem. Dec. 8/10/10.)  (Exhibits

2  to the Answer, Doc. 10, are referenced herein as "Exhibit ___.")

3      Petitioner was indicted in the Maricopa County Superior Court on August 29,

4  2008 in a fourteen count Indictment (Exhibit A), including charges of armed robbery,

5  kidnapping, burglary, and aggravated assault.

6      At trial, the prosecution presented testimony of three victim eyewitnesses and the

7  investigating officers, as well as various physical evidence, photographs, etc.  Counsel

8  did not object to the use of the identifications.

9      Following a jury trial, Petitioner was convicted on three counts of armed robbery,

10  four counts of kidnapping, two counts first-degree burglary, and four counts of

11  aggravated assault.  (Exhibit AA, Mem. Dec. at 2.)  On April 24, 2009, he was sentenced

12  to two sets of consecutive 15.75 year prison terms, resulting in a combined sentence of

13  31.5 years in prison.  (Exhibit U, Sentence; Exhibit T M.E. 4/24/9.)

14

15  **B.  PROCEEDINGS ON DIRECT APPEAL**

16      Petitioner filed a direct appeal, arguing error in the admission of the eyewitness

17  identifications and insufficient evidence.  (Exhibit Y, Opening Brief; Exhibit AA, Mem.

18  Dec. at 2.)  On August 10, 2010, the Arizona Court of Appeals reviewed the issues for

19  fundamental error because the issues had not been raised at trial.  They denied the appeal

20  and affirmed Petitioner's convictions and sentences.  (Exhibit AA, Mem. Dec.)

21      Petitioner did not seek further review.  (Exhibit AA, Order and Mandate; Petition,

22  Doc. 1 at 2.)

23

24  **C.  FIRST PROCEEDINGS ON POST-CONVICTION RELIEF**

25      On October 5, 2010, Petitioner filed a Notice of Post-Conviction Relief (Exhibit

26  BB) with the Maricopa County Superior Court.  Counsel was appointed who eventually

27  filed a Notice of Completion of Review (Exhibit DD), evidencing an inability to find an

28  issue for review.  Petitioner then filed a second Notice of Post Conviction Relief (Exhibit

EE), and then on July 18, 2011 filed a Petition for Post-Conviction Relief (Exhibit HH).

Petitioner's PCR petition argued a claim of newly discovered evidence, based on an affidavit from a victim (Munoz) disclaiming an ability to affirmatively identify Petitioner based upon his memory from the crime, as opposed to the photo lineup or press coverage. (Exhibit HH.)  In his Reply brief (Exhibit KK), Petitioner "repeatedly criticizes his trial counsel." (Exhibit LL, M.E. 11/9/11 at 6.)  On November 9, 2011, the PCR court dismissed the petition, finding the newly discovered evidence claim to be without merit, and any purported ineffective assistance claim precluded because it was improperly raised for the first time in a reply brief.  (Exhibit LL, M.E. 11/9/11.)

Petitioner requested extensions of time for a motion for reconsideration and petition for review (Exhibits MM and NN).  The PCR court granted Petitioner a 30 day extension, until January 19, 2012, to seek review.

Petitioner did not, however, seek further review.  (Petition, Doc. 1 at 3.)

## D.  SECOND PROCEEDINGS ON POST-CONVICTION RELIEF

On February 7, 2012, Petitioner filed his second PCR notice and petition (Exhibits PP and QQ).[1]   Petitioner raised various Fourth Amendment claims and argued ineffective assistance of appellate and PCR counsel.  On March 1, 2012, the PCR court summarily dismissed the petition, finding the claims untimely and either waived, precluded, or not cognizable.  (Exhibit SS, M.E. 3/1/12.)

Petitioner did not seek further review.  (Petition, Doc. 1 at 3; Exhibit UU Docket at 1.)

## E.  PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing through counsel his

---

[1] In his Motion to Strike (Exhibit OO) filed February 1, 2012, Petitioner argued that counsel had filed a second PCR petition in January, 2012, and sought to strike it. Petitioner's petition does not identify this proceeding.  The trial court's docket does not reflect such a filing.  (Exhibit UU, Docket at 1.)

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 1, 2012 (Doc. 1).  Petitioner's Petition asserts two grounds for relief: (1) his Fifth, Sixth, and Fourteenth Amendment rights were violated by the denial of the effective assistance of counsel at trial; and (2) he was denied the effective assistance of counsel on appeal and in state post-conviction proceedings.

**Response** - On March 18, 2013, Respondents filed their Response ("Answer") (Doc. 10).  Respondents argue that the Petition is untimely, and the claims procedurally defaulted or procedurally barred.

**Reply** - On April 16, 2013, Petitioner filed a Reply (Doc. 11).  Petitioner argues that his petition is timely because he is entitled to statutory tolling for the time in which he could have sought further review from the denial of his petitions for post-conviction relief, and he is entitled to equitable tolling based upon his *pro se* untrained status during his PCR proceedings, and he has been diligently pursuing his rights.  Petitioner seeks to excuse his procedural defaults on the same basis, pointing to the recent decision in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) to excuse his failings to properly challenge the effectiveness of trial and appellate counsel.

**III. APPLICATION OF LAW TO FACTS**

**A.  TIMELINESS**

**1.  One Year Limitations Period**

Respondents assert that Petitioner's Petition is untimely.  As part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress provided a 1-year statute of limitations for all applications for writs of habeas corpus filed pursuant to 28 U.S.C. § 2254, challenging convictions and sentences rendered by state courts.  28 U.S.C. § 2244(d).  Petitions filed beyond the one year limitations period are barred and must be dismissed. *Id.*

/ /

/ /

**2.  Commencement of Limitations Period**

The one-year statute of limitations on habeas petitions generally begins to run on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).   Here, Petitioner's direct review ended when his time expired for seeking further review of the Arizona Court of Appeals decision filed August 10, 2010 (Exhibit AA).   Under Ariz.R.Crim.Proc. 31.19(a), Petitioner had 30 days thereafter to seek review by the Arizona Supreme Court.   Thus, Petitioner's conviction was final on Thursday, September 9, 2010.  Therefore his one year began running on September 10, 2010, and without any tolling would have expired on September 9, 2011, making his November 1, 2012 Petition delinquent.

**3.  Statutory Tolling**

The AEDPA provides for tolling of the limitations period when a "properly filed application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).

**Tolling for First PCR Proceeding** - Under Arizona law, a petition for post-conviction relief is "pending" as soon as the notice of post-conviction relief is filed. *Isley v. Arizona Department of Corrections*, 383 F.3d 1054, 1055-56 (9th Cir. 2004) ("The language and structure of the Arizona postconviction rules demonstrate that the proceedings begin with the filing of the Notice.")

Here, Petitioner's first PCR proceeding was commenced with the filing of his PCR notice (Exhibit BB) on October 15, 2010.[2]  The PCR petition was ultimately denied

---

[2] Petitioner's PCR Notice was dated September 29, 2010, some 16 days prior to its filing. (Exhibit BB at 2.)  Similarly, Petitioner's second PCR Notice was dated January 9, 2012, but was not filed until February 7, 2012, some 29 days later. (Exhibit PP at 1, 3.) Nothing indicates how or when these were forwarded for filing, and Petitioner makes no assertion that he is entitled to application of the prison mailbox rule *See Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003) ("a *pro se* prisoner's filing of a state habeas petition is deemed filed at the moment the prisoner delivers it to prison authorities for forwarding to the clerk of the court").

by the PCR court on November 9, 2011.  (Exhibit LL, M.E. 11/9/11.)  Petitioner was granted through January 19, 2012 to file his petition for review.  (Exhibit NN, M.E. 12/20/11.)   Petitioner did not seek further review.

Respondents argue that because no petition for review was filed, no state application was pending after the November 9, 2011 order.  Petitioner argues that he is entitled to statutory tolling for an additional 71 days, until the time to seek review expired.  That 71 days makes all the difference.

In the seven circuits known to have addressed the matter, Petitioner's PCR proceeding would have been pending until his time to file for review expired, regardless of the fact that he did not again seek review. *See Bennett v. Artuz*, 199 F.3d 116 (**2nd Cir.**1999) ("a state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures"); *Swartz v. Meyers*, 204 F.3d 417, 420–24 (**3rd Cir.**2000) ("the period of limitation tolls during the time a prisoner has to seek review of the Pennsylvania Superior Court's decision whether or not review is actually sought"); *Taylor v. Lee*, 186 F.3d 557, 561 (**4th Cir.**1999) ("the entire period of state post-conviction proceedings, from initial filing to final disposition by the highest state court (whether decision on the merits, denial of certiorari, or expiration of the period of time to seek further appellate review), is tolled"); "); *Williams v. Cain*, 217 F.3d 303, 309–10 (**5th Cir.**2000); *Williams v. Bruton*, 299 F.3d 981, 983 (**8th Cir.**2002) ("the application is 'pending' (and thus the limitations period is tolled) during the appeal period, even if the petitioner does not appeal"); *Gibson v. Klinger*, 232 F.3d 799, 804 (**10th Cir.**2000) ("regardless of whether a petitioner actually appeals a denial of a post-conviction application, the limitations period is tolled during the period in which the petitioner could have sought an appeal under state law"); *Cramer v. Secretary, Dept. of Corrections*, 461 F.3d 1380, 1383 (**11th Cir.** 2006) (*per curiam*) ("the claim is pending regardless of whether the inmate actually files the notice of appeal  *See also Johnson v. McCaughtry*, 265 F.3d 559, 563 n. 3 (7th Cir. 2001) (declining to decide the issue); and *Yassan v. J.P. Morgan Chase and Co.*,

708 F.3d 963, 969 (7th Cir. 2013) (quoting *Cramer* approvingly in the context of a civil action).  *See also Hines v. Bartos*, 2007 WL 1381655, * 1 (D.Ariz. 2007) (CV 06-697-PHX-JAT) (concluding that "an appeal that is never filed cannot be considered timely and Petitioner cannot reap the benefit of statutory tolling without actually filing a petition for review of the post-conviction relief denial"); *Lopez v. Arizona*, 2011 WL 3471084, 6 (D.Ariz. 2011) (CV-10-2159-PHX-JAT(JRI)) (finding no equitable tolling after PCR court's decision, where petition for review was untimely, including for time review could have been sought).

In support of his argument that this Court should follow the other circuits, Petitioner points to the decision in *Lott v. Mueller*, 304 F.3d 918 (9th Cir. 2002), where the court found that statutory tolling continued on a California petition for writ of habeas corpus until 30 days after the California Supreme Court denied the petition.  (Reply, Doc. 11 at 4.)  However, *Lott* was based upon Rule 24 of the California Rules of Court which explicitly provided that a decision of the California Supreme Court did not become final until 30 days after filing.  Arizona has no comparable rule.  At best, Arizona provides for the delay of a mandate until times for a motion for reconsideration and petition for review have expired.  *See* Ariz.R.Crim.Proc. 31.23.  However, in *Hemmerle v. Schriro*, 495 F.3d 1069 (2007), the Ninth Circuit concluded that the date of issuance of mandates is irrelevant not only to when a conviction becomes final, but also when a post-conviction petition is no longer pending for purposes of tolling under 28 U.S.C. § 2244(d)(2).  Thus, *Lott* does not resolve the matter.

Respondent points to neither any circuits holding contrary to the identified circuit decisions, nor to any Ninth Circuit authority on the issue.  Instead, Respondent argues that this Court should buck the trend and rely upon the word "pending" in § 2244(d)(2), the absence of a reference to the expiration of the time for further review such as in §2244(d)(1)(A), and cases denying tolling for untimely petitions. Finally, Respondent argues that it should be irrelevant that Petitioner sought and obtained an extension of the time for a petition for review, citing *Saunders v. Senkowski*, 587 F.3d 543 (2nd Cir.

2009).  (Answer, Doc. 10 at 17-19.)

    _Effect of Extension_ – Respondents' latter argument is easily disposed of.  The Second Circuit in _Saunders v. Senkowski_, 587 F.3d 543 (2nd Cir. 2009), declined to extend its holding in _Bennett_ (that statutory tolling continued until the time for review expires) to motions for reconsideration of an intermediate appellate court's denial of leave to further appeal.  Here, no such tangential, elongated process is at play.  Rather, it is the straightforward expiration of the time for further review which _Saunders_ deemed to have been resolved in _Bennett_.  "In _Bennett_, we held that a § 440.10 motion is 'pending' for purposes of AEDPA at least from the time it is filed through the time in which the petitioner could file an application for a certificate for leave to appeal the Appellate Division's denial of the motion."  587 F.3d at 548.

    Thus, the undersigned accepts Respondent's argument that the fact of the extension is not controlling as to whether tolling applies, but concludes that if tolling does apply, the extension is determinative of the length of the tolling.  Here, because of the extension, Petitioner could have filed until conclusion of the extended deadline, at the end of the 71 days.

    That still leaves this Court to decide if tolling applies.

    _Carey_ Does Not Resolve the Issue – Respondents' statutory language argument based on the construction of the word "pending" does not resolve the matter.  It is tempting to conclude that "pending" means awaiting a decision, and thus where the Court of Appeals has decided the application before it and the Arizona Supreme Court has no application to review, there is no "application" waiting to be decided, or "pending."

    On the other hand, Petitioner cites _Carey v. Saffold_, 536 U.S. 214 (2002) to argue that "pending" is a term of art extending beyond a simplistic "is there an unresolved application."  (Reply, Doc. 11 at 3-4.)

    The holding of _Carey_ only answered the question whether the time **between** successive levels of post-conviction review is tolled, when the subsequent review is

actually sought.  In this case, however, Petitioner did not seek the subsequent review. Thus, the holding of *Carey* does not resolve the issue.

*Carey* did, however, impact the meaning of "pending."  Indeed, Justice Kennedy (along with the Chief Justice, and Justices Scalia and Thomas) argued in their dissent in *Carey* that the majority opinion adopted an expansive construction of "application" to mean the "ordinary state collateral review process," thereby permitting the word "pending" to apply to something other than a particular "application."  536 U.S. at 228-229 (Kennedy, J. dissenting).   That dissent, of course, is not the law of the land.

Respondent points to the fact that §2244(d)(1)(A) explicitly delays commencement of the limitations period until "the expiration of time for seeking…review" expires, while the tolling provisions of §2244(d)(2) do not include such language.  While a true statement, that argument is not dispositive.

Indeed, in finding that § 2244(d)(2) did not toll the statute of limitations during the pendency of a petition for writ of certiorari, the Court in *Lawrence v. Florida*, 549 U.S. 327 (2007) observed

> Furthermore, § 2244(d)(1)(A) refers to the "time for seeking" direct review, which includes review by this Court under Clay. By parity of reasoning, the "time for seeking" review of a state postconviction judgment arguably would include the period for filing a certiorari petition before this Court. However, § 2244(d)(2) makes no reference to the  "time for seeking" review of a state postconviction court's judgment. Instead, it seeks to know when an application for "State ... review" is pending. The linguistic difference is not insignificant: When the state courts have issued a final judgment on a state application, it is no longer pending even if a prisoner has additional time for seeking review of that judgment through a petition for certiorari.

*Id.* at  333-34.  However, while employing the absence of the time-for-further-review distinction, the *Lawrence* court primarily relied upon the limitation of § 2244(d)2) to "state" petitions, which did not encompass federal certiorari petitions, and the statute's narrow application to collateral review while certiorari petitions were part of the direct review process.

Moreover, in *Carey*, the court did not rely upon the time-for-further-review

9

language to conclude that the statute allowed interregnum tolling.  Indeed, neither the majority nor the dissent cited that language.

Instead, the *Carey* court found interregnum tolling based solely upon their construction of the word "pending" in §2244(d)(2):

> That definition, applied in the present context, means that an application is pending as long as the ordinary state collateral review process is "in continuance"-i.e., "until the completion of" that process. In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains "pending."

536 U.S. at 219-20.  Thus, the Court concluded that §2244(d)(2) extends tolling to "the time between a lower state court's decision and the filing of a notice of appeal to a higher state court." *Id.* at 217.

But *Carey* was based upon the continuance of the process.  It did not address what happened when the process ultimately did not continue.  Nor does the language of *Carey* resolve the issue whether the state process is "in continuance" while the clock is running out on the time for further review.  Until such time, arguably the lower court decision has not "achieved final resolution,"  at least to the extent that it remains subject to further attack.

Moreover, it is troubling to conclude that as the time for further review elapses, the "application" is both pending and not.  If further review is timely sought, it was pending the whole time.  If further review is not timely sought, then it turns out that the application ceased pending upon the lower court's determination.  Under this approach, post-conviction proceedings are not unlike Schrödinger's potentially-poisoned-cat, which is for a time simultaneously alive and dead, until its box is opened to see which.[3]

This indeterminate state is not a mere theoretical puzzle, but potentially has real implications.  As noted by the majority in *Carey*, the principles of exhaustion would preclude a habeas petition so long as further review was possible. 536 U.S. at 220.  Thus,

---

[3] *See* http://en.wikipedia.org/wiki/Schrödinger's_cat (last accessed 4/22/13) (discussing the thought experiment proposed by Austrian physicist Erwin Schrödinger in 1935 to explore the quantum entanglement theory of quantum mechanics in which matter is said to exist simultaneously in either of two states or both, until measured).

until the time for further review elapsed, and the possibility for review terminated, a federal habeas petition would be premature.  This would be true even if the petitioner had no intention of seeking further state review.

For example, assume that before commencing a PCR proceeding, a petitioner had only 15 days of his one year limitations period remaining.  But the time for seeking further review on the state PCR petition was 30 days.  A habeas petition would be due within 15 days of a trial court decision on the PCR petition.  But, the petition would be premature until the 30 days for further review elapsed.  But once it elapsed, the clock is retroactively deemed to have begun running at the outset of the 30 day time.  The problem becomes even more pronounced in a jurisdiction such as California, with an indeterminate, "reasonable" time, deadline for further review.

<u>Decisions flowing from *Pace*</u> – Nonetheless, *Carey* is not the only resource to answer the question.  Rather, there remains a series of Ninth Circuit cases which, although not espousing an explicit response, have repeatedly concluded that tolling was not available beyond the lower court's decision.

Indeed, at least one commentator has concluded that the Ninth Circuit has properly concluded that a grant of tolling until the time to appeal expires is "inconsistent with the Supreme Court's decisions [indicating] that if a state petition is untimely, none of the time before (or during) the court's consideration of the petition is statutorily tolled." *See* Means, *Fed. Hab. Man.* § 9A:57 (2010).

The Ninth Circuit decisions are progeny of the Supreme Court's opinion in *Pace v. DiGuglielmo*, 544 U.S. 408 (2005).  As discussed in *Pace*, for a state petition to toll the statute of limitations, it must be "properly filed."  28 U.S.C. § 2244(d)(2).  The *Pace* Court held that when a state post-conviction petition is untimely under state law, then it is not "properly filed" within the meaning of § 2244(d)(2) for purposes of statutory tolling.

In *Bonner v.* Carey, the Ninth Circuit read *Pace* to mean that "if a state court denies a petition as untimely, ***none of the time*** before or during the court's consideration

11

of that petition is statutorily tolled." *Bonner v. Carey*, 425 F.3d 1145, 1149 (9th Cir.2005), *amended on other grounds by* 439 F.3d 993 (9th Cir.2006) (emphasis added).

It is true that nothing in *Pace* explicitly holds that the time between a state application and the expiration of the time to appeal therefrom is excluded from statutory tolling. Factually, *Pace* (like *Carey)* dealt with an interregnum gap between successive post-conviction petitions, and focused on whether the second petition was "properly filed," not how long the prior petition was pending. 544 U.S. at 411. Similarly, *Bonner* dealt with whether a state habeas petition filed in the California trial court was untimely, and thus none of the time during its pendency (including several levels of appeal) was tolled. However, neither *Pace* nor *Bonner* itself expressly analyzed the tolling effect of time available for appeal after a timely but unsuccessful petition.

The undersigned would be tempted to conclude that the comment in *Bonner* that "none of the time…is tolled" was simply *dicta*, and proceed with the explicit analysis of the other circuits. However, in *Thorson v. Palmer*, 479 F.3d 643 (9th Cir.2007), the court quoted the aforementioned portion of *Bonner* and specifically held that its petitioner was not entitled to any time after the denial of his intermediate appeal, merely because the California Supreme Court had deemed his final appeal to be untimely. *Thorson* held that the petitioner's limitations period "would have begun to run again on the date the California Court of Appeal denied Thorson's second petition and would not have stopped until he filed his federal habeas petition." 479 F.3d at 646.

The undersigned is troubled by what arguably is an unexplained expansion of *Pace* emanating from the dicta of *Bonner*, and continuing in the holding of *Thorson*. In addition, it bears some consideration whether these decisions were driven by the indeterminate review deadlines applicable in California. Nonetheless, the language of these Ninth Circuit cases admit of no distinction based upon the nature of the state's filing deadlines. Instead, this Court is left with the Ninth Circuit's clear pattern of denying any tolling beyond the lower court's denial when a subsequent petition for review is not timely filed.

12

Conclusion re First PCR - Accordingly, the undersigned concludes that Petitioner is not, under the decisions of the Ninth Circuit in *Bonner* and *Thorson*, entitled to statutory tolling for the time during which he could have, but did not, seek review from the Arizona Supreme Court on his first PCR petition.

As discussed hereinabove, Petitioner's one year began running on September 10, 2010.  His first PCR was commenced on October 15, 2010 (Exhibit BB), using 36 days of his one year, leaving him with 329 days.  The first PCR was denied on November 9, 2011.  (Exhibit LL, M.E. 11/9/11.)  Thus, Petitioner would have had through Monday, October 3, 2012 to file his federal habeas petition.

**Second PCR Proceeding** - On February 7, 2012, Petitioner filed his second PCR notice and petition (Exhibits PP and QQ).  At that time, Petitioner still had 239 days of his one year remaining.  On March 1, 2012, the PCR court summarily dismissed the petition. (Exhibit SS, M.E. 3/1/12.)   Petitioner did not seek further review.  (Petition, Doc. 1 at 3; Exhibit UU Docket at 1.)   Although some of Petitioner's claims were dismissed as untimely, others were not.  Accordingly, Petitioner is entitled to statutory tolling for the time from February 7, 2012 through March 1, 2012. For the reasons discussed above, he is not for the period during which he could have sought fruthe review by the Arizona Court of Appeals.

Accordingly, Petitioner's one year would have commenced running again as of March 2, 2012, and would have expired 239 days later, on October 26, 2012.

Petitioner did not commence the current case until the filing, through counsel, of his Petition on November 1, 2012 (Doc. 1).  Thus, absent equitable tolling, Petitioner's habeas petition was some six days delinquent.

**4.  Equitable Tolling**

**Applicable Standard** - "Equitable tolling of the one-year limitations period in 28 U.S.C. § 2244 is available in our circuit, but only when 'extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time' and 'the

13

extraordinary circumstances were the cause of his untimeliness.'"  *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003).

> To receive equitable tolling, [t]he petitioner must establish two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way. The petitioner must additionally show that the extraordinary circumstances were the cause of his untimeliness, and that the extraordinary circumstances ma[de] it impossible to file a petition on time.

*Ramirez v. Yates,* 571 F.3d 993, 997 (9th Cir. 2009) (internal citations and quotations omitted).  "Indeed, 'the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule.' "  *Miranda v. Castro,* 292 F.3d 1063, 1066 (9th Cir. 2002)  (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.). Petitioner bears the burden of proof on the existence of cause for equitable tolling.  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006) ("Our precedent permits equitable tolling of the one-year statute of limitations on habeas petitions, but the petitioner bears the burden of showing that equitable tolling is appropriate.").

Petitioner argues that in *Holland v. Florida*, 560 U.S. ____, 130 S.Ct. 2549, 2564 (2010), the Court created a rebuttable presumption in favor of equitable tolling. (Reply, Doc. 11 at 4.)  The presumption applied in *Holland* was not one that equitable tolling should be found in an individual case, but that a presumption that a given statute of limitations was subject to equitable tolling at all.  That presumption was raised in the course of deciding "whether AEDPA's statutory limitations period may be tolled for equitable reasons," *Holland*, 130 S.Ct. at 2550, which the Court decided in the affirmative after applying the presumption.

Thus, Petitioner remains subject to the burden of affirmatively proving his own entitlement to equitable tolling.

Here, Petitioner argues that he is entitled to equitable tolling based upon: (1) his *pro se* status throughout most of the PCR proceedings; (2) the lack of advice by counsel on the statute of limitations; (3) his diligence in pursuing his claims; (4) the *de minimus*

1  nature of any delinquency; and (5) his justifiable reliance upon the availability of tolling

2  until his time for further review of his PCR proceedings.  (Reply, Doc. 11 at 2-3.)

3      ***Pro Se* Status / Lack of Advice** - The first two circumstances, Petitioner's *pro se*

4  status and lack of advice on the statute of limitations, do not establish grounds for

5  equitable tolling.  A prisoner's *pro se* status is not an extraordinary circumstance.  *Felder*

6  *v. Johnson*, 204 F.3d 168 (5th Cir. 2000).  A prisoner's "proceeding pro se is not a 'rare

7  and exceptional' circumstance because it is typical of those bringing a § 2254 claim."

8  *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000).  Moreover, "ignorance of the law,

9  even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing."

10  *Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir.1999). ).  *See also Rasberry v. Garcia*, 448

11  F.3d 1150, 1154 (9th Cir. 2006) ("a pro se petitioner's lack of legal sophistication is not,

12  by itself, an extraordinary circumstance warranting equitable tolling").

13      Although an attorney's behavior can establish the extraordinary circumstances

14  required for equitable tolling, mere negligence or professional malpractice is insufficient.

15  *Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir.2001).  A "garden variety claim of

16  excusable neglect,' such as a simple 'miscalculation' that leads a lawyer to miss a filing

17  deadline does not warrant equitable tolling.' "  *Holland v. Florida*, 560 U.S. ____, 130

18  S.Ct. 2549, 2564 (2010). Rather, the attorney's misconduct must rise to the level of

19  extraordinary circumstances.  *Id.*  An unadorned failure to advise about a limitations

20  period would, at best, be simple negligence.  *Cf. Spitsyn v. Moore,* 345 F.3d 796, 801 (9th

21  Cir. 2003) (allowing equitable tolling where petitioner's counsel was hired almost a year

22  in advance, failed to do anything to prepare the petition or to respond to numerous letters

23  and phone calls, and withheld petitioner's file for over two months after the limitations

24  period expired); *Holland*, *supra* (discussing potential for finding of extraordinary

25  circumstances where counsel misinformed petitioner about filing deadline, failed to

26  communicate conclusion of state appeals, and failed to communicate with petitioner at

27  all over a period of years, all despite repeated requests by petitioner).

28      Here, the most Petitioner asserts is that PCR counsel failed to find issues for

15

review, and thus sought permission for Petitioner to file his own petition. Petitioner asserts none of the kinds of extraordinary conduct by counsel which would justify equitable tolling.

**Reliance on Other Circuits** - Petitioner's also asserts extraordinary circumstances based upon his justifiable reliance upon the decisions of other circuits finding the availability of tolling until his time for further review of his PCR proceedings. Petitioner argues that he "could have incorrectly relied on this premise in his calculations." (Reply, Doc. 11 at 5.)

The Ninth Circuit has found that a "habeas petitioner who decides when to file his federal habeas petition by relying on Ninth Circuit precedent that is later overturned by the Supreme Court is entitled to equitable tolling." *Nedds v. Calderon*, 678 F.3d 777, 781 (9th Cir. 2012). Moreover, the petitioner is not required to affirmatively show that he actually relied on the precedent in deciding when to file, but may rely upon circumstances creating a presumption of reliance. *Id.* at 782-783.

Here, Petitioner points to no Ninth Circuit precedent on which he could have relied to delay his filing. No provision is made for reliance on other circuits, and there simply was no binding Ninth Circuit precedent in Petitioner's favor on which he could have relied. Rather, had Petitioner sought for Ninth Circuit authority on which to rely, he would have been faced with the *Bonner* and *Thorson* cases upon which the undersigned relies to conclude that tolling is not available during the time for unsought further review.

Thus, Petitioner is, at best, in the same position as a party who has simply miscalculated the deadline, a circumstance which does not justify equitable tolling. *See e.g. Miranda v. Castro*, 292 F.3d 1063, 1068 (9th Cir. 2002); *Frye v. Hickman*, 273 F.3d 1144 (9th Cir. 2001).

***De Minimus* Delay and Diligence** - Plaintiff's remaining arguments are based upon the *de minimus* nature of his delinquency, and his diligence at pursuing his claims.

The law is clear that even if extraordinary circumstances prevent a petitioner from

16

filing for a time, equitable tolling will not apply if he does not continue to diligently pursue filing afterwards.  "If the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing." *Valverde v. Stinson*, 224 F.3d 129, 134 (2nd Cir. 2000).  *But see  Lott v. Mueller*, 304 F.3d 918 (9th Cir. 2002), McKeown, J. dissenting (arguing that equitable tolling should work a stoppage of the clock, with a resulting extension of the deadline).  Ordinarily, thirty days after elimination of a roadblock should be sufficient.  *See Guillory v. Roe*, 329 F.3d 1015, 1018, n.1 (9th Cir. 2003).

In this case, it is true that Plaintiff was diligent in pursuing his claims in the state courts.  He allowed little more than one month to elapse between direct review and his first PCR, and only about three months between his first and second PCR proceedings.

However, eight months passed thereafter, before he filed his federal petition.

A short delay after the expiration of the limitations period might be relevant if Petitioner proffered some extraordinary circumstance which would justify equitable tolling prior to that point.  The shortness of the delay could establish diligence.  The shortness of the delay, by itself, however, does not relieve Petitioner of the effect of his having filed after the limitations period expired  *See, e.g., United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.2000) (federal habeas petition submitted one day late was properly dismissed as untimely under AEDPA); *Lattimore v. Dubois*, 311 F.3d 46, 53–54 (1st Cir.2002) (reversing district court's decision to give the petitioner a "grace period" and dismissing a habeas petition as untimely when it was submitted one day late); *Lookingbill v. Cockrell*, 293 F.3d 256, 265 (5th Cir.2002) (stating "[w]e have consistently denied tolling even where the petition was only a few days late").  C*f. United States v. Locke,* 471 U.S. 84, 100–01 (1985) ("If 1–day late filings are acceptable, 10–day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline...A filing deadline cannot be

complied with, substantially or otherwise, by filing late—even by one day.").

Accordingly, neither the nearness of Petitioner to the mark, nor his diligence before the state courts, established grounds for equitable tolling in the face of his substantial delay thereafter in filing his federal petition.

**Conclusion** – Petitioner has failed to show circumstances which would justify equitable tolling of the statute of limitations.  Thus, Petitioner's Petition was untimely.

## 5.  Actual Innocence

The Ninth Circuit has concluded that the habeas statute of limitations is subject to an exception for claims of actual innocence. *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011). Petitioner makes no such claim in this proceeding.

## 6.  Summary

Petitioner's time for seeking "direct review" ended on September 9, 2010, on the expiration of his time to seek review by the Arizona Supreme Court on direct appeal. Accordingly, Petitioner's one year limitations period began running on September 10, 2010.  The running of the limitations period was tolled during the pendency of his first PCR proceeding, from October 15, 2010 through November 9, 2011, and during the pendency of his second PCR proceeding, from February 7, 2012 through March 1, 2012. Thus his limitations period expired on October 26, 2012.  His Petition was not filed until November 1, 2012, and was delinquent.  Petitioner has failed to show exceptional circumstances and diligence in bringing his federal petition to justify equitable tolling, and has not asserted actual innocence to avoid the limitations period.  Therefore, his federal habeas petition is untimely, and must be dismissed with prejudice.

## B.  EXHAUSTION & PROCEDURAL DEFAULT

Respondents also argue that Petitioner has failed to properly exhaust, and now has procedurally defaulted, his state remedies, and thus is barred from federal habeas review.

1   (Answer, Doc. 10 at 25, *et seq.*)  Petitioner argues that any procedural default should be

2   excused because Petitioner was largely unrepresented throughout his post-conviction

3   proceedings, and post-conviction counsel was ineffective.  (Reply, Doc. 11 at 5-7.)

4          Because the recommended dismissal on the statute of limitations involves issues

5   subject to debate, the undersigned will address Respondents' alternative procedural

6   defenses.

7

8   **1. Exhaustion Requirement**

9          Generally, a federal court has authority to review a state prisoner's claims only if

10  available state remedies have been exhausted.  *Duckworth v. Serrano*, 454 U.S. 1, 3

11  (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been

12  codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on

13  the petitioner to show that he has properly exhausted each claim.  *Cartwright v. Cupp,*

14  650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied,* 455 U.S. 1023 (1982).

15         Ordinarily, "to exhaust one's state court remedies in Arizona, a petitioner must

16  first raise the claim in a direct appeal or collaterally attack his conviction in a petition for

17  post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*,  33 F.3d 36, 38 (9th

18  Cir. 1994).   Only one of these avenues of relief must be exhausted before bringing a

19  habeas petition in federal court.  This is true even where alternative avenues of reviewing

20  constitutional issues are still available in state court.  *Brown v. Easter*, 68 F.3d 1209,

21  1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*,

22  489 U.S. 1059 (1989).  "In cases not carrying a life sentence or the death penalty, 'claims

23  of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona

24  Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir.

25  2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

26

27  **2.  Procedural Default**

28         Ordinarily, unexhausted claims are dismissed *without prejudice*.  *Johnson v.*

*Lewis*, 929 F.2d 460, 463 (9th Cir. 1991).  However, where a petitioner has failed to properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief.  Dismissal *with prejudice* of a procedurally barred or procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Respondents argue that Petitioner may no longer present his unexhausted claims to the state courts.  Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. Proc. 32.2(a) and time limit bar, set out in Ariz. R. Crim. P.  32.4.  (Answer, Doc. 10 at 20, 21, n. 18.)[4]

**Remedies by Direct Appeal** - Under Ariz.R.Crim.P. 31.3, the time for filing a direct appeal expires twenty days after entry of the judgment and sentence. Accordingly, direct appeal is no longer available for review of Petitioner's unexhausted claims.

**Remedies by Post-Conviction Relief** – Under Arizona's waiver and timeliness bars, Petitioner can no longer seek review by a subsequent PCR Petition.

Waiver Bar - Under the rules applicable to Arizona's post-conviction process, a claim may not ordinarily be brought in a petition for post-conviction relief that "has been waived at trial, on appeal, or in any previous collateral proceeding."   Ariz.R.Crim.P. 32.2(a)(3).   Under this rule, some claims may be deemed waived if the State simply shows "that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding."  *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (quoting Ariz.R.Crim.P. 32.2, Comments).   For others of "sufficient constitutional magnitude," the State "must show that the defendant personally, "knowingly, voluntarily and intelligently' [did] not raise' the ground or denial of a right."  *Id.*  That requirement is

---

[4] The Court's scheduling Order directed that "that any allegations of procedural default or application of an independent and adequate state ground shall include an indication of the specific state rule(s) and/or authorities alleged to bar the affected claim(s)."  (Order 12/21/12, Doc. 4 at 2.)  Respondents' footnote reference to Rules 32.2(a) and 32.4(a) meets the letter of that direction, but not its spirit.

limited to those constitutional rights "that can only be waived by a defendant personally." *State v. Swoopes* 216 Ariz. 390, 399, 166 P.3d 945, 954 (App.Div. 2, 2007). Indeed, in coming to its prescription in *Stewart v. Smith*, the Arizona Supreme Court identified: (1) waiver of the right to counsel, (2) waiver of the right to a jury trial, and (3) waiver of the right to a twelve-person jury under the Arizona Constitution, as among those rights which require a personal waiver.  202 Ariz. at 450, 46 P.3d at 1071.[5]  Claims based upon ineffective assistance of counsel are determined by looking at "the nature of the right allegedly affected by counsel's ineffective performance.  *Id.*

Here, Petitioner's claims of ineffective assistance have at their core the kinds of claims not within the types identified as requiring a personal waiver, *e.g.* the fairness of identification procedures and permissibility of searches.

Timeliness Bar - Even if not barred by preclusion, Petitioner would now be barred from raising his claims by Arizona's time bars.   Ariz.R.Crim.P. 32.4 requires that petitions for post-conviction relief (other than those which are "of-right") be filed "within ninety days after the entry of judgment and sentence or within thirty days after the issuance of the order and mandate in the direct appeal, whichever is the later."  *See State v. Pruett*, 185 Ariz. 128, 912 P.2d 1357 (App. 1995) (applying 32.4 to successive petition, and noting that first petition of pleading defendant deemed direct appeal for purposes of the rule).   That time has long since passed.

Exceptions - Rules 32.2 and  32.4(a) do not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h).  *See* Ariz. R. Crim. P.  32.2(b) (exceptions to preclusion bar); Ariz. R. Crim. P.  32.4(a) (exceptions to timeliness bar).  Petitioner has not asserted that any of these exceptions are applicable to

---

[5] Some other types of claims addressed by the Arizona Courts in resolving the type of waiver required include: right to be present at non-critical stages (waived by omission), *Swoopes*, 216Ariz. at 403, 166 P.3d at 958; improper withdrawal of plea offer (waived by omission), *State v. Spinosa*, 200 Ariz. 503, 29 P.3d 278 (App. 2001); double jeopardy (waived by omission), *State v. Stokes*, 2007 WL 5596552 (App. 10/16/07); illegal sentence (waived by omission), *State v. Brashier*, 2009 WL 794501 (App. 2009); judge conflict of interest (waived by omission), *State v. Westmiller*,  2008 WL 2651659 (App. 2008).

his claims.    Nor does it appears that such exceptions would apply.   The rule defines the

excepted claims as follows:

> d. The person is being held in custody after the sentence imposed has expired;
> e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
> (1) The newly discovered material facts were discovered after the trial.
> (2) The defendant exercised due diligence in securing the newly discovered material facts.
> (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.
> f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or
> g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or
> h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

Ariz.R.Crim.P. 32.1.

Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona prisoner who is simply attacking the validity of his conviction or sentence.   Where a claim is based on "newly discovered evidence" that has previously been presented to the state courts, the evidence is no longer "newly discovered" and paragraph (e) has no application.   Here, Petitioner has long ago asserted the facts underlying his claims. Paragraph (f) has no application where the petitioner filed a timely notice of post-conviction relief.   Paragraph (g) has no application because Petitioner has not asserted a change in the law since his last PCR proceeding.   Finally, paragraph (h), concerning claims of actual innocence, has no application to Petitioner's procedural claims.

Therefore, none of the exceptions apply, and Arizona's time and waiver bars would prevent Petitioner from returning to state court.   Thus, Petitioner's claims that

were not fairly presented are all now procedurally defaulted.

### 3.  Procedural Bar on Independent and Adequate State Grounds

Related to the concept of procedural default is the principle of barring claims actually disposed of by the state courts on state grounds.  "[A]bsent showings of 'cause' and 'prejudice,' federal habeas relief will be unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.' " *Walker v. Martin*, - - - U.S. - - -, 131 S.Ct. 1120, 1127 (2011).

In *Bennett v. Mueller*, 322 F.3d 573 (9th Cir.2003), the Ninth Circuit addressed the burden of proving the independence and adequacy of a state procedural bar.

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.

*Id.* at 584-585.

### 4. Application to Petitioner's Claims

**No Fair Presentation** - For his Ground 1, Petitioner argues that his Fifth, Sixth, and Fourteenth Amendment rights were violated by the denial of the effective assistance of counsel at trial, based upon counsel's failure to challenge: (1) an unduly suggestive pre-trial identification; (2) the reliability of an in-court eye-witness identification; and (3) the admissibility of an improperly seized wallet. (Petition, Doc. 1 at 4-12.)  For his Ground 2, Petitioner argues that his Fifth, Sixth, and Fourteenth Amendment rights were violated by the denial of counsel during his PCR proceedings.

Both of Petitioner's claims are founded upon the ineffective assistance of or lack

of counsel.  Petitioner's only foray into the Arizona Court of Appeals was on direct appeal.  He asserted no claims of ineffective assistance of counsel in that proceeding.  Nor could he have raised in that proceeding the lack of counsel in the subsequent post-conviction proceedings.

It is true that Petitioner's direct appeal addressed at least some of the facts underlying his ineffectiveness of trial counsel claim, *e.g.* the errors in admission of the eyewitness identifications.  However, that is not sufficient to fairly present the ineffective assistance claims Petitioner now asserts.  "While [the ineffective assistance and underlying constitutional claim are] admittedly related, they are distinct claims with separate elements of proof, and each claim should have been separately and specifically presented to the state courts."  *Rose v. Palmateer*, 395 F.3d 1108, 1112 (9th Cir. 2005).

Accordingly, Petitioner did not properly exhaust his state remedies on any of the claims he raises in this proceeding.

**Procedural Bar** - Nonetheless, Petitioner did arguably raise some of his claims to the PCR court.

Claims Concerning Trial Counsel - In the first PCR proceeding, although the petition was founded solely upon a claim of newly discovered evidence, the PCR court noted that "[i]n his reply brief, petitioner repeatedly criticizes his trial counsel." (Exhibit LL, M.E. 11/9/11 at 6.)  Indeed, Petitioner complained that trial counsel failed to object to the various eyewitness identifications and the seized wallet. (Exhibit KK at 1-3.)

However, the PCR court found that any such claim was waived based upon Petitioner having raised it for the first time in his reply brief, and without seeking leave to amend his PCR petition.  Thus, this claim was disposed of by the state court on state grounds.

Petitioner proffers nothing to suggest that this was not an independent and adequate state ground.  Accordingly, the undersigned finds that Petitioner's claims concerning trial counsel were procedurally barred.

Claims Concerning PCR Counsel - In his second PCR proceeding, Petitioner

24

argued that appellate and PCR counsel were ineffective in failing to challenge the identifications and seizure of evidence. Petitioner cited a variety of federal authorities in support of his assertion of ineffective assistance, including *Cuyler v.* Sullivan, 446 U.S. 335 (1980). (Exhibit QQ, 2nd PCR Pet. at 14-15.) The PCR court held:

> In regards to appellate counsel, the defendant cannot raise a claim of this nature in an untimely or successive petition for post-conviction relief See Ariz. R. Crim. P. 32.4(a). Additionally, the defendant raised this claim in his previous Rule 32 proceeding that was dismissed on November 9, 2011. Therefore, he is precluded from raising the issue in subsequent Rule 32 proceeding. See Ariz. R. Crim. P. 32.2(a)(2). In regards to previous post-conviction relief counsel, defendants who were entitled to a direct appeal have no constitutional right to . effective assistance of counsel in post-conviction relief proceedings. *See State v. Pruett*, 185 Ariz. 128, 912 P.2d 1023 (App. 1996). Therefore, the claim raised by the defendant is not cognizable under Ariz. R. Crim. P. 32.1.

(Exhibit SS, M.E. 3/1/12 at 2.)

Thus, the PCR Court disposed of Petitioner's attack on PCR counsel by concluding that he failed to allege a constitutional violation, and thus had not asserted a claim cognizable under Ariz.R.Crim.Proc. 32.1. In so doing, the PCR court was required to determine that Petitioner had no federal constitutional right to effective assistance of counsel in his PCR proceeding.

Federal habeas review of a defaulted federal claim is precluded only when the state court has disposed of the claim on a procedural ground "that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). A state procedural default ruling is not independent if application of the bar depends on an antecedent ruling on the merits of the federal claim. *See Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985)). A state court applying a state procedural bar that is "interwoven" with consideration of federal claims does not bar habeas review. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

Accordingly, the state court's rejection of this claim was interwoven with its determination that there was no federal constitutional right to counsel in a PCR proceeding. Therefore, this would not be the application of an independent and adequate

state ground, leaving this claim merely not properly exhausted by virtue of Petitioner's failure to seek review by the Arizona Court of Appeals.

### 4.  Summary Regarding Procedurally Defaulted Claims

Petitioner's claims are all either not properly exhausted by his failure to seek review by the Arizona Court of Appeals, and thus now procedurally defaulted, or procedurally barred on an independent and adequate state ground.  Thus, his claims are precluded from habeas review absent cause and prejudice or actual innocence.

### D. CAUSE AND PREJUDICE

### 1. Standard

If the habeas petitioner has procedurally defaulted on a claim, or it has been procedurally barred on independent and adequate state grounds, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

"Cause" is the legitimate excuse for the default.  *Thomas v. Lewis*, 945 F.2d 1119, 1123 (1991). "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (quoting *Reed*, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990).  The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

Here, Petitioner asserts his untrained, *pro se* status and the lack of adequate assistance of PCR counsel in his first PCR proceeding (coupled with the denial of additional time for research) as good cause to excuse his failures to exhaust and

1  procedural bars.

2

3  **2.  *Pro Se* Status**

4      The "cause and prejudice" standard is equally applicable to *pro se* litigants,

5  *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990); *Hughes v. Idaho State Board*

6  *of Corrections*, 800 F.2d 905, 908 (9th Cir. 1986).   Accordingly, the mere fact that

7  Petition was unrepresented at various times does not establish cause.

8

9  **3.  Ineffective Assistance**

10 **a.  Ineffectiveness as Cause**

11     Ineffective assistance of counsel may constitute cause for failing to properly

12 exhaust claims in state courts and excuse procedural default.  *Ortiz v. Stewart*, 149 F.3d

13 923, 932, (9th Cir. 1998).   However, ordinarily, to meet the "cause" requirement, the

14 ineffective assistance of counsel must amount to an independent constitutional violation.

15 *Id.* Accordingly, where no constitutional right to an attorney exists (e.g. in a PCR

16 proceeding), ineffective assistance will not amount to cause excusing the state procedural

17 default.  *Id.*   However, the Supreme Court has recently recognized two exceptions to this

18 requirement, in *Maples*  and  *Martniez.*.

19     In  *Maples v. Thomas*, 132 S.Ct. 912 (2012), the Supreme Court held that cause

20 could be shown when post-conviction counsel was not merely negligent (and under the

21 law of agency, that negligence being chargeable to the petitioner) but had abandoned the

22 representation without notice to the petitioner, resulting in the loss of his state remedies.

23     In  *Martinez v. Schriro*, 132 S.Ct. 1309 (2012), the Court held that "where, under

24 state law, claims of ineffective assistance of trial counsel must be raised in an initial-

25 review collateral proceeding, a procedural default will not bar a federal habeas court

26 from hearing a substantial claim of ineffective assistance at trial if, in the initial-review

27 collateral proceeding, there was no counsel or counsel in that proceeding was

28 ineffective."  *Id.* at 1320.

*Maples* has no application here.  PCR counsel in Petitioner's first proceeding did file a notice (Exhibit DD) indicating his inability to find an issue for review and seeking leave for Petition to file a petition on his own.  However, Petitioner was given notice of that filing, and not only was given, but exercised a right to file his own petition.  (*See* Exhibit DD, Notice at 2 (reflecting service on Petitioner); Exhibit FF, M.E. 6/10/11; and Exhibit HH, 1st PCR Pet.)  Thus, unlike the Petitioner in *Maples*, Petitioner was not abandoned, nor even left without notice to pursue his claims on his own.

*Martinez*, on the other hand, does apply.  Petitioner asserts (in his Ground One) that trial counsel was ineffective.  He asserts in his Ground Two and his Reply that PCR counsel was ineffective in failing to raise those claims.  If, indeed, PCR counsel was ineffective, then Petitioner will have established cause to excuse his procedural default.

For Petitioner to rely upon *Martinez*, Petitioner must "demonstrate[e] two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'"  *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012)  (quoting *Martinez*, 132 S.Ct. at 1318).

Respondents argue that Petitioner cannot rely upon *Martinez* because Petitioner has not exhausted his state remedies on his claim of ineffective assistance of PCR counsel.  (Answer, Doc. 10 at 28-29.) However, the Ninth Circuit has held that "an ineffective assistance of PCR counsel claim used to establish cause for a procedural default of a claim for ineffective assistance of sentencing counsel need not be exhausted itself."  *Dickens v. Ryan*, 688 F.3d 1054, 1072 (9th Cir. 2012).

Thus, this Court must resolve whether, under *Martinez*, Petitioner's PCR counsel was ineffective so as to provide cause for Petitioner's failure to properly exhaust his claims concerning the ineffectiveness of trial counsel.

/ /

**b.  Standard for Ineffectiveness**

Generally, claims of ineffective assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on such a claim, Petitioner must show:  (1) deficient performance - counsel's representation fell below the objective standard for reasonableness; and (2) prejudice - there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at  687-88.  Although the petitioner must prove both elements, a court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial.  *Id.* at 697.

There is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy.   *U.S. v. Quinterro-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995), *cert. denied*, 519 U.S. 848 (1996); *U.S. v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991).    The court should "presume that the attorneys made reasonable judgments and decline to second guess strategic choices."  *U.S. v. Pregler*, 233 F.3d 1005, 1009 (7th Cir. 2000).

An objective standard applies to proving such deficient performance, and requires a petitioner to demonstrate that counsel's actions were "outside the wide range of professionally competent assistance, and that the deficient performance prejudiced the defense."  *United States v. Houtcens*, 926 F.2d 824, 828 (9th Cir. 1991) (quoting *Strickland*, 466 U.S. at 687-90).    The reasonableness of counsel's actions is judged from counsel's perspective at the time of the alleged error in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689.

"The law does not require counsel to raise every available nonfrivolous defense. Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (citations

omitted).

Moreover, it is clear that the failure to take futile action can never be deficient performance. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996); *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).  "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."  *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982).

In evaluating the ineffectiveness of PCR counsel (and as part thereof, the ineffectiveness of trial counsel), this habeas Court is not constrained by the limits on grants of habeas relief in 28 U.S.C. § 2254, *i.e.* state court decisions contrary to or unreasonable application of Supreme Court law, etc.. *Cf. Martinez*, 132 S.Ct. at 1320 (finding limits on habeas relief for ineffectiveness of PCR counsel not applicable to cause and prejudice determination).

## c.  Alleged Ineffectiveness of PCR (and Trial) Counsel

Petitioner argues three instances of deficient performance by trial counsel which should have been challenged by PCR counsel:

> A competent attorney, representing Petitioner on a petition for post-conviction relief pursuant to Rule 32, Arizona Rules of Criminal Procedure, [(1)] would have argued ineffective assistance of counsel, by virtue of trial counsel's failure to challenge two suggestive out-of-court identifications prior to trial, [(2)] his failure to challenge eyewitness in-court identification, and [(3)] his failure to challenge an illegal search and seizure of Petitioner's vehicle.

(Petition, Doc. 1 at 4.  *See also* Reply, Doc. 11 at 5-7.)

### (1) Failure to Challenge Out-of-Court Identifications

Petitioner argues that the "evidence of guilt was limited to two eye-witness identifications from one home invasion, and one eye-witness identification from the second…Under these circumstances, it was incumbent upon trial counsel to make a reasonable effort to challenge the admissibility of that evidence before it was presented to the jury." (Reply, Doc. 11 at 6.)  Petitioner argues that trial counsel "did not file any

pretrial motions with respect to the identification issues." (*Id.*)

### (a) Show-up Identification

Petitioner complains about the use of a "one-person show-up identification procedure" when the victim Belem Vega identified Petitioner. Petitioner argues that Due Process precludes the use of unduly suggestive pretrial identification procedures. (Petition, Doc. 1 at 7.)

Petitioner correctly argues that under state law, the prosecution bears a burden of establishing, by clear and convincing evidence, that the identification procedures were not unduly suggestive, and/or that subsequent in-court identifications were not tainted by them. (*Id.*, citing *State v. Dessureault*, 104 Ariz. 380, 384, 452 P.2d 951, 955 (1969).) In *Dessureault*, the Arizona Supreme Court laid out the process for evaluating challenges to identification procedures:

> First, if at the trial the proposed in-court identification is challenged, the trial judge must immediately hold a hearing in the absence of the jury to determine from clear and convincing evidence whether it contained unduly suggestive circumstances. In this the burden is on the prosecution to establish from all the circumstances surrounding the pretrial identification that it was not such as to be unduly suggestive.
> Second, if the trial judge concludes that the circumstances of the pretrial identification were unduly suggestive or that the prosecution has failed to establish by clear and convincing evidence that they were not, then it is the prosecution's burden to satisfy the trial judge from clear and convincing evidence that the proposed in-court identification is not tainted by the prior identification.

*Dessureault*, 104 Ariz. at 384, 453 P.2d 951, 955 (Ariz. 1969).

In the second phase, the court considers the factors identified in *Neil v. Biggers*, 409 U.S. 188 (1972). "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200 (1972). *See also State v. Tresize*, 127 Ariz. 571, 575, 623 P.2d 1, 5 (1980).

31

**Suggestiveness** –   To establish that the show-up identification was unduly suggestive, Petitioner points to the fact that Petitioner was the only person shown to Vega and was in handcuffs and accompanied by at least one officer.  However, neither circumstance makes a show-up identification unduly suggestive.

The essence of a show-up identification is the presentation of a single suspect. "As an initial matter, we note that in most cases it is unavoidable that a show-up at the scene of a crime will be suggestive of guilt to a certain degree. Nevertheless, [the Ninth Circuit] has found that show-ups are not objectionable unless the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *U.S. v. Kessler*, 692 F.2d 584, 585 (9th Cir. 1982) (internal citations and quotations omitted).   Accordingly, the presentation of Petitioenr alone was not unduly suggestive.

Neither is the fact that Petitioner was in handcuffs and accompanied by at least one officer.  The Ninth Circuit has recognized that such a presentation need not be found unduly suggestive:  "The use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses." *U.S. v. Kessler*, 692 F.2d 584, 586 (9th Cir.1982). *See also U.S. v. Bagley*, 772 F.2d 482 (9th Cir. 1985) (finding one-man show-up at bank with defendant handcuffed and surrounded by law enforcement officers within an hour and a half of the robbery was suggestive, but not impermissibly so).

Here, Officer Mills testified that Petitioner was handcuffed to insure officer safety, in light of the number of people from Petitioner's residence at the scene, outnumbering the officers.  (Exhibit K, R.T. 1/7/09 at 59.)  Moreover, the show-up identification occurred between 30 minutes and less than three hours after the robbery. Vega testified:

> Q. At some point, were you asked to look at a suspect to determine whether it was someone who was involved in the armed robbery?

32

A. Yes.

Q. Okay. About how long after the actual armed robbery did that occur?

Q. [sic] About an hour, 45 minutes; about an hour.

(Exhbit I, R.T. 1/6/9 at 192.)

Vega testified that after the robbery, she called 9-1-1 and the police arrived at her home ten minutes later.  (Exhibit I, R.T. 1/6/9 at 192.)  Officer Mills testified that he was dispatched to Vega's home at "around midnight."  (Exhibit K.R.T. 1/7/09 at 29.)  Officer Mills testified that the identification occurred "shortly after midnight,"  (Exhibit K, R.T. 1/7/09 at 67), but also stated it occurred "at zero - - or 2:36 in the morning (*Id.* at 51.)

On cross-examination, Vega agreed with defense counsel's characterization as a half hour:

Q. Okay. Now, later on that evening, actually within about half an hour or so, a police officer showed you my client, highlighted in the police headlights, in handcuffs and you identified him, right?

A. Yes.

(Exhibit K, R.T. 1/7/09 at 9.)

Petitioner also complains that he was 50 feet away when Vega identified him at the show up identification. (*See* Exhibit K, R.T. 1/7/09 at 66-67.)   However, while this may or may not have impacted the reliability of the identification, Petitioner fails to suggest how it made it unduly suggestive.  The undersigned might be tempted to find undue suggestiveness had the witness been so far away that it suggested the officers intended her to identify Petitioner as the perpetrator regardless of whether she recognized him, or, perhaps if she had asked for a closer look and the officer refused.  But here, Vega was being asked to identify someone she already knew.

Vega testified that during the robbery she recognized Petitioner as one of the people who hang around a neighboring property.

Q. So is that the person that you first saw in the kitchen?

A. Yeah, he was the one at the kitchen, yeah, by the kitchen.

Q. And once that person that got close to you -- you said only a couple of feet, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Did you recognize him then?

1

A. Yes. Yeah.

Q. How did you recognize him? What did you recognize him from?

2

A. From next door, because I would see them hanging out there all of the time.

3

* * *

Q. So, okay. So then you noticed this person who came up close was saying - - and was saying "Let's go" from being at the house, I guess closest to 83rd Avenue, is that right?

4

5

A. Uh-huh.  Correct.

6

(Exhibit I, R.T. 1/6/9 at 189.)

7

Conversely, suggestiveness of the procedure was decreased by the facts that the

8

officer advised Vega to make no assumptions based on Petitioner's being handcuffed;

9

and he advised Vega to not presume that Petitioner was the suspect. (Exhibit K RT

10

1/7/09 at 52-53.)

11

Under these circumstances, the undersigned finds no basis to conclude that the

12

show-up identification procedures were unduly suggestive. Conversely, the undersigned

13

concludes that had trial counsel obtained a *Dessureault* hearing on the Vega

14

identification, the trial court would have found clear and convincing evidence that the

15

identification procedure was not unduly suggestive.

16

"If we find that a challenged procedure is not impermissibly suggestive, our

17

inquiry into the due process claim ends."  *U.S. v. Bagley*, 772 F.2d 482, 492 (9th Cir.

18

1985).  It is only after finding it unduly suggestive, that the court is required to consider

19

the *Biggers* factors.  *Id.  See also State v. Taylor*, 27 Ariz. App. 330, 333, 554 P.2d 926,

20

929 (Ariz. App. 1976).

21

Even if the undersigned could find the lineup unduly suggestive, the undersigned

22

would find that the identification was nonetheless reliable in light of the *Biggers* factors.

23

**Opportunity to View at Crime** – Petitioner argues that Vega had only a limited

24

opportunity at the time of the crime to view the perpetrator she identified as Petitioner.

25

Vega described three perpetrators.  She described the man who woke her in her

26

bedroom.  (Exhibit I, R.T. 1/6/09 at 179.)  When she left her bedroom to get her money

27

to give to the intruder, she saw two other men, one by the front door in the living room,

28

and one in the kitchen by the broken back door who she identified as Petitioner.  (*Id.* at

34

182.)  Vega's ability to view Petitioner was limited.

Although she described her house as "pretty small," she described Petitioner as initially being "pretty far" from her.  (*Id.* at 182-184.)  Then she described him coming closer:

> Q.  And there is a third person?
> A.  Yes.
> Q.  Where is that third person?
> A.  In the kitchen by the door, by the glass door..
> Q.  And that's the one who is fairly close to
> A.  No, he was pretty far.
> Q.  About the same distance from me to you, is that right?
> A.  Yes.
> Q.  Can you describe that person?
> A.   That one, I couldn't really see him that well because it was kind of far. And they were also telling me not to look at them and like to look down, so he was too far. I couldn't really see him that well.
> Q.   Well, what about him could you see?
> A.   He was pretty tall, too, and not really skinny; maybe around -- he was pretty tall, like six feet.
> Q.  Did you recognize him?
> A.  I -- kind of, yeah, I would.
> Q.  How did you recognize him?
> A.  Well, at some point when they were taking too long, he came closer and that's when I saw him a little bit closer, because he came closer to tell them that he was taking too long, that they needed to leave.

(Exhibit I, R.T. 1/6/9 at 183-185.)

On cross-examination, Vega indicated she was able to see only portions of Petitioner:

> Q. Because the eyes is the only thing you saw, right?
> A. Yeah.
> Q. Was --
> A. Just the eyes and the head, this part (indicating).
> Q. They were wearing ball caps over their heads, weren't they?
> A. No, they weren't.
>                           * * *
> Q. Okay. They were wearing bandanas, though?
> A. Yes, they were.
> Q. And the bandanas were up to a level just under their eyes?
> A. Yes.

(Exhibit K, R.T. 1/7/09 at 10-11.)

Nonetheless, as noted herein above, Vega testified that during the robbery she

35

recognized Petitioner as one of the people who hang around a neighboring property. (Exhibit I, R.T. 1/6/9 at 189.)   Similarly, in *U.S. v. Crozier*, the Sixth Circuit found an increase in reliability, based on opportunity to view, when a robbery victim had previously seen the defendant in the store, taking note of him as not being a regular customer.

**Degree of Attention** – There is no suggestion here that Vega was a "casual or passing observer. *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977).  She was, after all, the one being robbed.  To be sure, Petitioner suggests that an expert might have opined of the risks of "weapons focus" in such situations, essentially asserting that the witnesses would have been too distracted by the weapons to pay enough attention to the perpetrators to identify them.  However, Petitioner offers nothing to suggest that such actually happened in this case.

**Accuracy of Prior Description** - The absence of a prior description cuts against the reliability of the show-up identification.  *See U.S. v. Crozier*, 259 F.3d 503, 511-512 (6th Cir. 2001).  The parties point to nothing in the record to indicate that Vega gave anything more than a vague physical description of Petitioner prior to the show up identification, *i.e.* that the culprits were African American males.[6]  (Exhibit K, R.T. 1/7/09 at 60.)

Officer Mills testified that Vega had described the perpetrator at the back door as wearing a hat.

> Q. So the person -- she told you that SP-3 is or the person that you listed person that was listed as SP-3 in your report that person was wearing a baseball cap?
> A.  Yes, sir.

---

[6] At trial Vega testified that the perpetrator by the back door was "pretty tall, like six feet," and "not really skinny."  (Exhibit K, R.T. 1/7/09 at 185.)  However, there is no indication that this description had been provided prior to the show up identification. Similarly, Vega testified at trial that the gloves worn by the culprits were not latex or rubber gloves, but a thick material, like work gloves, and were not wearing ball caps. (Exhibit I, R.T. 1/6/09 at 199.)  Cross-examination suggested she had told police officers that they were all wearing ball caps.  (Exhibit K, R.T. 1/7/09 at 11.)  However, there was no affirmative evidence that Vega had provided the descriptions of the gloves or hats prior to the show-up identification.

36

> Q.  And she told you that that's the person that she identified in the one-on-one show-up in front of the police car with the lights on, right?
> A.  Yes, sir.

(Exhibit K, R.T. 1/7/09 at 66.)  The parties point to no testimony as to whether Petitioner did or did not have a hat on at the time of the show up identification, although there was testimony that indicated there was a hat in the car.  (*See* Exhibit K, R.T. 1/7/09 at 141.)

However, Vega offered the clear description that the culprits hung around the neighborhood, particularly at the house on the corner.  This description had been made available before Petitioner was apprehended coming out of that house.  (*See* Exhibit K, R.T. 1/7/09 at 84-85.)

Petitioner does point to discrepancies in Vega's description of Petitioner's actions and dress.  On cross-examination, defense counsel questioned Vega about whether at the show-up identification she had identified Petitioner as being the perpetrator at the front door, rather than at the back door.

> Q. So if -- okay. So you did not tell the police officer that the person he was showing you was the guy by the front door?
> A. No, I didn't tell him that.
> * * *
> Q.   You told the police officer that the guy you saw was the guy by the back door?
> A. I don't really remember them asking me where he was. I don't remember them telling me where exactly he was in the house.

(Exhibit K, R.T. 1/7/09 at 9-10.)  The officer, on the other hand, testified that Vega identified Petitioner as the perpetrator at the front door:

> Q. Okay. And when -- when she identified my client, you had my client standing in front of the police car with the lights on in handcuffs, and she identified him.
>       She told you that that's the guy that was by the front door, right?
> A. Yes, sir.

(Exhibit K, R.T. 1/7/09 at 63.)     The prosecution attempted to impeach the officer's testimony by suggesting that the officer had simply become confused in his understanding or recording of Vega's statements about the various perpetrators.  (*Id.* at 74-75.)  But the officer remained adamant that Vega told him Petitioner was at the front door.  (*Id.* at 80-81.)

However, this discrepancy relates to Vega's overall credibility.  It does not create an inference that Vega identified Petitioner as the culprit merely because of his presence at the show up identification.  In applying *Biggers*, the courts are not tasked to evaluate the reliability of the witness, but the reliability of the identification procedure.

It is true the defense attempted to clarify with Vega at trial that there was a difference in her description of the two:  the culprit at the front door had "really short hair," while the culprit at the back door (who she identified as Petitioner) had puffy  hair, pulled back.  (Exhibit K, R.T. 1/7/09 at 8-9.  *See also* R.T. 1/6/09 at 183.)  However, as with the location itself, there is no indication that Vega had proffered those descriptions prior to the show-up identification.

**Level of Certainty** – Although perhaps fuzzy on some details of the crime and investigation, Vega expressed no hesitancy in any of her identifications of Petitioner.

**Elapsed Time** – As discussed hereinabove, the show-up identification occurred between 30 minutes and less than three hours after the robbery.  That was soon enough to point to the reliability of Vega's identification.

**Analysis of Evidentiary Challenge** – For the reasons discussed hereinabove, the undersigned concludes that the Vega identification procedure was not unduly suggestive.  Even if deemed unduly suggestive, the undersigned would find that the identification was none the less reliable.

The witness's limited opportunity to view the perpetrator, and (to a limited extent) the absence of a matching prior physical description, contribute to the possibility of a misidentification.  The minimal elapsed time, certainty of the witness, and instructions given to the witness at the show-up identification all reduce the possibility.

The most critical factor, however, was the witness's pre-existing familiarity with Petitioner as a regular in the neighborhood.  That familiarity provides reliability that would overcome the limited opportunity for observation, lack of prior physical description, and confusion over other details.  The most brief and limited of viewings can allow an observer to identify a familiar person.   Further, it would reduce the

38

1  suggestiveness of the show-up identification; the witness was not, in her mind,

2  identifying the visage she saw in her home so much as identifying that Petitioner was the

3  person she already knew the perpetrator to be.

4      In sum, the undersigned concludes that the trial court would have found clear and

5  convincing evidence that "under the 'totality of the circumstances' the identification was

6  reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at

7  199.

8      **Analysis of Trial Counsel** - Under these circumstances, the undersigned cannot

9  find that the probability of success in an attempt to exclude the identification evidence

10  from Vega was great enough that trial counsel was "outside the wide range of

11  professionally competent assistance," *Strickland*, 466 U.S. at 687-90, in not raising the

12  argument.

13      Even if counsel was deficient in challenging Vega's identification, and could have

14  successfully excluded it, the undersigned cannot find a reasonable probability that the

15  outcome of the proceeding would have been different.  There remained other substantial

16  evidence against Petitioner, including the wallet and vitamins from the first robbery in

17  Petitioner's vehicle, the (albeit unused) latex gloves in his vehicle, the holster and bullets

18  in the car, Petitioner's discovery near the second robbery, and the other identifications.

19      Even if all the identifications were excluded, the undersigned cannot find a

20  reasonable probability that the jury would have been swayed from convicting, given the

21  remaining evidence.

22      Nonetheless, *Martinez* does not mandate that Petitioner show that his underlying

23  claim of ineffective assistance of trial counsel would have been a winner, merely that it

24  was "substantial," i.e. that it "has some merit." *Martinez*, 132 S.Ct. at 1318.  Here, the

25  undersigned may not ultimately be swayed, but that is not to say that the claim is

26  insubstantial or has no merit.

27      Thus, this Court must proceed to analyze PCR counsel's performance.

28      **Analysis of PCR Counsel** – The other prong of the *Martinez* analysis asks

39

1    whether, in light of the purported ineffectiveness of trial counsel, PCR counsel was

2    ineffective.   Only if PCR counsel was operating "outside the wide range of

3    professionally competent assistance," *Strickland*, 466 U.S. at 687-90, in failing to raise

4    trial counsel's ineffectiveness, can Petitioner's procedural default be excused.

5        At this stage, the analysis comes full circle to the ultimate evaluation of the

6    underlying claim.[7]   Here, given the undersigned's conclusion that the evidentiary attack

7    would have ultimately been unsuccessful (both at the "unduly suggestive" stage and the

8    reliability stage) and that there was no prejudice, and thus the attack on trial counsel

9    would have been unsuccessful, it follows that the undersigned cannot find that PCR

10   counsel performed deficiently in failing to raise the claim.   Similarly, the undersigned

11   cannot find a reasonable probability that the outcome would have been different had

12   PCR counsel mounted the claim.

13       Therefore, the undersigned finds no cause to excuse the procedural default arising

14   from the Vega identifications.

15

16   **(b) Munoz Photo Lineup**

17       Next, Petitioner argues that the photo identifications by Miguel Munoz, a victim

18   at the first robbery, should have been challenged.  Petitioner argues the photo lineup was

19   unduly suggestive, pointing to: (1) Munoz' initial uncertainty; and (2) his subsequent

20   retraction of the identification.  (Petition, Doc. 1 at 5, 7, 10.)   The propriety of photo

21   identifications are determined under the standards adopted in *Biggers*.   *Manson v.*

22   _____

23   [7] The undersigned recognizes that in many instances the two *Martinez* prongs are so
     intertwined that they will be subsumed into one analysis focused on one or the other
24   prongs, *i.e.* trial counsel's performance or PCR counsel's performance.  There remains,
     however, a clear distinction between the prongs.  For example, there are gradations of
25   the potential for success, and ultimate effect, of the foregone tactic.  Some underlying
     claims will be so attractive that trial counsel was clearly ineffective, and thus (barring
26   inability to discover, or other impediments), PCR counsel was clearly ineffective in not
     raising it.  Others may be so clearly meritless that both trial and PCR counsel were
27   obviously not ineffective in avoiding the claim.  And there may be still others, in the
     middle ground, that are substantial enough that (while perhaps not guaranteed of
28   success) they require a determination whether PCR counsel had other tactical reasons to
     raise or not raise  the claim, *i.e.* the availability or absence of other, more attractive,
     claims, or was otherwise acting reasonably in foregoing the claim.

1    *Braithwaite*, 432 U.S. 98 (1977); *State v. Martinez*, 121 Ariz. 62, 588 P.2d 355 (App.
2    1978).

3          **<u>Suggestiveness</u>** – Petitioner has pointed to no particular suggestiveness in the
4    photo lineup procedure.

5          Officer Cordova indicated that another detective had selected 12 similar photos,
6    and had a computer place them in random order and print out the photo lineup.  (Exhibit
7    K, R.T. 1/7/09 at 98-99.)  Cordova separated Munoz from Tonya Hards, and showed
8    Munoz the lineup.  (*Id.* at 100-101. *See also*, Exhibit I, R.T. 1/6/9 at 129.)  Munoz was
9    advised about the limitations of the photos and that no identification need be made.
10   (Exhibit K, R.T. 1/7/09 at 102-104.)

11         Munoz stated that he did not recognize anyone from the photo lineups. (*Id.* at 101,
12   111; Exhibit I, R.T. 1/6/09 at 54.)  Although, Munoz testified that he had told the officer
13   that he thought that Petitioner's photo looked like the perpetrator, he was not sure.

14         Subsequently, the lineups were shown to Hards, who eventually identified
15   Petitioner's photo as the perpetrator who had been at the front door.  (*Id.* at 104-105.)
16   Munoz then asked to look at the photo lineups again.  (*Id.* at 102.)  There is no indication
17   whether Munoz was permitted to again view the lineups.

18         At trial, Munoz testified that Petitioner looked "very, very much like I
19   remember." (Exhibit I, R.T. 1/6/09 at 58.)

20         Subsequently, Munoz executed an Affidavit indicating that he was not sure
21   whether his in court identification was based upon his memory from the time of the
22   crime, or developed from the lineup pictures and TV news reports.  (Exhibit HH, PCR
23   Petition at Exhibit A, Affidavit.)

24         On these facts, the undersigned finds no reason to conclude that the photo lineup
25   procedure was unduly suggestive.  *See e.g. State v. Taylor*, 27 Ariz. App. 330, 332-333,
26   554 P.2d 926, 928-929 (Ariz. App. 1976) (photo lineup not unduly suggestive where no
27   challenge to photos used or manner of presentation); *U.S. v. Monks*, 774 F.2d 945 (9th
28   Cir. 1985) (photo lineup not unduly suggestive where no direction toward defendant was

1  given, no other witnesses present, and nothing to indicate defendant should be chosen).

2  Even if deemed unduly suggestive, the undersigned would find that the

3  identification was not unreliable.

4  **Opportunity to View** – Petitioner points to no limitation in Munoz's opportunity

5  to view the perpetrator.  At trial, Munoz described Petitioner as the perpetrator who

6  stayed at the door during the invasion, during the several minutes the other two searched

7  the home.  (Exhibit I, R.T. 1/6/09 at 50-51, 61-62.)  He described his interaction with

8  Petitioner at the time of the crime:

9       Q. BY MR. TREON: What is it about the defendant that you
        recognize?
10      A. Well, like I said, I remember he spent two minutes right in
        front of me and thinking -- going back to that and I look at him, and
11      he's been looking at me, like I went back to when he was looking at
        me and it reminds me a lot. It reminds me a lot. It's like lived it
12      again; he was looking at me.

13  (Exhibit I, R.T. 1/6/09 at 59.)

14  Munoz also described all of the perpetrators as wearing baseball caps pulled down

15  and bandanas covering the lower half of their faces so that all he could see was their

16  eyes.  (Exhibit I, R.T. 1/6/09 at 68; Exhibit K, R.T. 1/7/09 at 111-112.)

17  **Degree of Attention** –Munoz was, like Vega, no casual observer, but a victim of

18  the crime.

19  **Accuracy of Prior Description** – As with Vega, the record does not reflect

20  anything other than a vague prior description, *i.e.* that the perpetrators were African

21  American males, and that Petitioner (the man at the front door) was about five feet ten

22  inches tall. However, Munoz also described the culprits as wearing latex gloves and dark

23  baseball caps.   (Exhibit I, R.T. 1/6/09 at 70-71.)   A cap and latex gloves were found in

24  Petitioner's car.  (Exhibit K, R.T. 1/7/09 at 138-139 (gloves), 142-144 (hat).)

25  Munoz offered conflicting testimony at trial over whether the culprits were using

26  shirts or bandanas to cover their faces.  (Exhibit I, R.T. 1/6/09 at 68 (bandanas), 102 -103

27  (shirts).)  He testified, however, that he did not know at the time what a bandana was and

28  what he told police was that their faces were covered with their shirts. (*Id.* at 103-104,

140.)

**Level of Certainty** – When interviewed by police officers at the scene, Munoz denied being able to identify the perpetrators:

> Q. Okay. Did you ask him if he thought he could identify these folks?
> A. Yes.
> Q. And what did he tell you?
> A. He said no.

(Exhibit I, R.T. 1/6/09 at 169.)  It is unclear, particularly given Munoz's broken English, whether this was intended to relate an inability to recognize them in the future, or an inability to provide their names, etc.

At trial, Munoz testified that he was unable to identify anyone from the photo lineup.  (Exhibit I, R.T. 1/6/09 at 53-54.)  He clarified that he told the officer he might recognize Petitioner's picture as familiar, but he was not sure.  (*Id.* at 63.)   Detective Cordova agreed that Munoz "didn't give any indication at all that he recognized anybody."  (Exhibit K, R.T. 1/7/09 at 110-111.)

In any event, Munoz was unable to positively identify Petitioner in the photo lineup, offered only a half-hearted identification at trial, and subsequently further qualified the identification in his affidavit.

Petitioner points to that affidavit as further evidence that the photo lineup was suggestive.  Assuming that such post-trial evidence is properly considered in a *Biggers* analysis, the undersigned does not find it significant.  At best, the affidavit edges further away from Munoz's testimony about the lineup and trial identifications that Petitioner looked like he remembered, and clarifies that the memory could have come from the crime, from the lineup, or from TV coverage.  Given the weakness of the identifications previously offered, the witness's further confusion, some two years after trial, does not significantly alter the landscape of circumstances of the identifications.   It is not Munoz's credibility (his memory, etc.) which is at issue, but rather the suggestive effect of the photo lineup and is effect on the reliability of his identifications.

**Elapsed Time** - Officer Cordova testified that he showed the photo lineup to

43

Munoz the morning after the incident at about 10:00 or 10:15.  (Exhibit K, R.T. 1/7/09 at 97-98.)  Munoz described the events as occurring after 10:00 pm (Exhibit I, R.T. 1/6/09 at 38).  Thus barely 12 hours, or less, had transpired.

**Analysis of Evidentiary Challenge** – The factors indicating the likelihood that a misidentification occurred from the photo lineup include Munoz's limited ability to view the perpetrators as a result of the baseball caps and bandanas or shirts covering their faces.  The factors to the contrary include his degree of attention and the elapsed time. The accuracy of his prior description is limited by the extent of that description, but his description did match with respect to Petitioner's race, gender, and his possession (albeit in his car, rather than on his person) of latex gloves and a cap.

Munoz's lack of certainty in his identifications is a dual edged sword.  On the one hand, the fact that despite finding Petitioner's photo familiar he refused to identify him suggests that the lineup procedure was not suggestive.  This is not a situation where Petitioner has claimed that the lineup was rigged to direct Munoz to his picture, e.g. by presenting pictures similar to each other but not to Petitioner's photo, etc. In the latter type of scenario, a half-hearted identification indicates that the suggestiveness worked. In this situation, the half-hearted identification indicates that the lineup was not suggestive, and left the witness to rely solely upon his own memory.

On the other hand, by the time of trial, Munoz had become more comfortable with identifying Petitioner. There is some inference, particularly in light of his post-trial affidavit, that this may have come from seeing Petitioner's photo.  However, the affidavit indicates that ambivalence whether Munoz had been tainted by the photo lineup, press coverage, or simply seeing Petitioner at the defense table in court.

Ultimately, the fact that Munoz was unwilling to affirmatively identify Petitioner in the photo lineup, and the limited nature of his identification at trial, lead the undersigned to conclude that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199.

**Analysis of Trial Counsel** –   Even if the undersigned could conclude that the evidentiary claim had merit, two tactical considerations lead the undersigned to conclude that trial counsel was not deficient for failing to challenge Munoz' in-court identification based upon his exposure to the photo lineup.

First is the weakness of the claim.  Effective counsel chooses his battles wisely, and doesn't mount every possible challenge. *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Here, trial counsel could have easily concluded that pursuing this claim was unwise because of the oddness of challenging an out-of-court identification procedure where no identification had been made, and where there was nothing demonstrably suggestive about the photo lineup procedure.

Second, counsel could have made the reasonable tactical decision that allowing the testimony by Munoz cast doubts upon the photo lineup identification by Hards, who spent most of the time during the robbery hiding under the covers, and had even less of an opportunity to view the perpetrators than did Munoz.

Finally, given the hesitations in Munoz's identification at trial (and thus its limited effect on the jury), and the other evidence of Petitioner's guilt, the undersigned cannot find a reasonable probability that the outcome of the trial would have been different had trial counsel successfully excluded evidence of the photo lineup and/or the in court identification. Thus, the undersigned cannot find prejudice from the failure of trial counsel to pursue the claim.

**Analysis of PCR Counsel** – Here, the question whether the claim of ineffectiveness of trial counsel was "substantial" under the first *Martinez* prong is far closer than with the Vega identification.  Given the tactical considerations and lack of prejudice described above, the undersigned finds that the claim was not "substantial.," *i.e.* that it does not have "some merit." *Martinez*, 132 S.Ct. at 1318

Even if the undersigned presumes that the claim was substantial, the undersigned cannot say that PCR counsel performed deficiently by failing to raise the ineffectiveness claim.  PCR counsel could have reasonably concluded that the claim was so without

45

merit that it was not worth raising.

Accordingly, the undersigned concludes that Petitioner has failed to meet the requirements of *Martinez* as to this claim, and thus has failed to show cause to excuse his procedural default.

**(c) Hards Photo Lineup** – Next Petitioner complains about the identification by Tonya Hards, a victim at the first home invasion.

**Suggestiveness** – The only particular element of the photo lineup complained of by Petitioner is the fact that Hards was encouraged or permitted to utilize business cards to shield the tops and bottoms of the photos, and that this was suggested or permitted while she was viewing the lineup in which Petitioner's photo was contained.

The testimony at trial indicated that the morning after the crimes, Hards was presented two or three photo lineups, one of which included Petitioner's photo. Although Munoz had been previously shown the lineups, she was not present in the room, and Munoz had not communicated the results of his viewing and was Munoz was not present with Hards while she looked at the lineups.  Hards was instructed that she need not identify anyone from the lineups, and that the perpetrators pictures may or may not be in the lineups. She did not know whether anyone else had made an identification or any evidence found.

At trial Hards testified:

> Q. Well, when you looked at those photographs and -- you're looking at photographs of a person's full face, is that right?
> A. Yes.
> Q. When you looked at them that way that first time, did you recognize anyone immediately?
> A. No.
> Q. Okay. And to be fair, the night that this happened, the night before, were you able to see their full faces?
> A. No, I did not see their full face.
> Q. And do you remember that because you had not seen their full faces -- well, did you tell the detective that you couldn't pick someone?
> A. Yeah, I told him that it's going to be hard for me to pick someone out and people have distinguishing features, and the only part I got to see of them was their eyes.

1
2
3
4
5
6
7
8
9
10
11
12
13

So he asked me that if he were to hand me a card and if I were to cover it, would I be able to identify somebody, if I feel I would be able to identify somebody. And I thought that was a good idea, so I asked him for two cards to cover the top and the mouth and the

Q. And did you do that?

A. Yes, I did.

Q. And once you did that and you covered up the mouth and nose -- and did you cover up kind of like the hair or forehead?

A. Yes.

Q. I guess when you did that, I guess the only thing left was the people's eyes, is that right?

A. That's right.

Q. And when you looked at just the eyes, did any of the pictures stand out to you?

A. Yes.

Q. And did you do anything to indicate that it stood out to you?

A. Just the feeling that they gave me.

Q. Did you say anything to the detective?

A. Yeah, I said that those look like the eyes that I that I seen.

Q. The eyes that you saw that night, the night of August 19th, when you saw the person come into the house or when you saw the person with the gun, do you see a person with those eyes in the courtroom today?

A. Yes, sir.

14  (Exhibit I, R.T. 1/6/09 at 131-132.)  Hards then identified Petitioner. (*Id.* at 133.)

15      On cross-examination, Hards indicated that using the business cards "was the

16  detective's idea." (Exhibit I, R.T. 1/6/09 at 148.)

17
18
19
20
21
22
23
24

Q. Okay. And up to that point, you had not said to the detective -- you had not told him, well, you know, his eyes were really noticeable; if you cover up everything but the eyes, I bet I can -- I could pick the eyes out?

You didn't say anything like that, did you? .

A. I said I had that I'd have to see a lineup, I had -- I'd have to see a lineup without having a hat on and something covering their mouth so I could identify that way, because a mouth and nose are very distinctive features on a person. So when that's added on to a pair of eyes t it changes everything.

So when I had told him I would need to see a lineup like that t he said: Well, if I give you a business card to cover it up would that help you?

And I told him: Yes.

(Exhibit I, R.T. 1/6/09 at 148-149.)

25
26
27
28

    The undersigned finds the "suggestiveness" arising from the offer of the business

cards to be very limited. The officer was not pressuring the witness to make an

identification by offering the cards. Rather, he was responding to the witness's own

1   suggestion that the viewing the entire mugshot was distracting.

2           Further, a finding of suggestiveness depends upon the assumption that Hards

3   would infer from the offer of the cards that the suspect was to be found among the

4   photos.  That inference is already implicit in any photo lineup, despite any admonition to

5   the contrary.  What rationale policeman with no suspect would bring random photos a

6   few dozen at a time? *Cf. Dickerson v. Fogg,* 692 F.2d 238, 245 (2nd Cir. 1982) (officer

7   "illegitimately pressured [witness] into taking a second and third look at [suspect] after

8   his first tentative identification").  Nothing in this situation served to go beyond that

9   inherent suggestiveness of the photo lineup.

10          Petitioner complains that the officer did this while Hards was viewing the lineup

11  containing Petitioner's picture.  That, without more, does not significantly increase the

12  suggestiveness. It might be more suggestive if, for example, the officer had placed the

13  business cards over Petitioner's face and asked the witness to take another look at

14  Petitioner.  But here, the witness was looking at a group of 6 photos in the one grouping,

15  and there is nothing to indicate she was discouraged from going back to the other

16  group(s).  *See e.g. U.S. v. Collins*, 559 F.2d 561 (9th Cir. 1977) (six photo lineup not

17  unduly suggestive).

18          The goal of the *Biggers* analysis is to avoid unreliable identifications that result

19  from identification procedures that, in essence, point the witness to the suspect.  *See*

20  *Simmons v. U.S.*, 390 U.S. 377, 383 (1968) (unduly suggestive "if the police display to

21  the witness only the picture of a single individual who generally resembles the person he

22  saw, or if they show him the pictures of several persons among which the photograph of

23  a single such individual recurs or is in some way emphasized").  The process is unduly

24  suggestive if it "made it all but inevitable that [the witness] would identify [defendant]

25  whether or not he was in fact 'the man,'" where "[i]n effect, the police repeatedly said to

26  the witness, 'This is the man.'"  *Foster v. California*, 394 U.S. 440, 443 (1969).

27          The offer of business cards to restrict the view of the photographs did not point

28  the witness to any photograph in particular.  The officer was simply responding to the

48

concerns of the witness viewing the photos, much in the same way that one might offer to turn on better lighting or block the glare of the sun.  Moreover, restricting the photos to the portion of perpetrators visible to the witness could serve to increase the reliability of the identification by limiting the witness to relying on what they actually observed.

In sum, the undersigned cannot find that the Hards photo lineup was unduly suggestive.

Even if deemed unduly suggestive, the undersigned would find the identification nonetheless reliable under the *Biggers* factors.

**Opportunity to View** – Hards opportunity to view the perpetrator was limited by by their baseball caps and coverings over their faces (Exhibit I, R.T. 1/6/09 at 121).

> Q.  Okay. Were you able to see the person with the gun who you said was kind of partly by the bar and partly by the couch, could you see his face?
> A. Yes, I seen his face.
> Q. What part of his face could you see?
> A. Only his eyes.
> Q. Could you see around his eyes at all?
> A.  Just seen from right about here (indicating).
> Q. And when you're saying "right about here", you're putting your hand above and below your eyes?
> A. Yes.

(Exhibit I, R.T. 1/6/09 at 124-125.)  On cross examination, Hards clarified that the hats were on normally, just above the eyebrows.  (*Id.* at 141-142.)

Hards opportunity to view was limited in time by her decision to hide under the covers on the couch where she was sleeping.

> Q. And so once you were woken up and you heard the people talking about the robbery, other than actually being awake, did you do anything?
> A. I removed the blankets from on top of me and I had popped my head up. And I had seen the person standing there with the gun over my head, over the couch, and I just layed back down and covered myself back up with the blanket.

(Exhibit I, R.T. 1/6/09 at 119.)

**Degree of Attention** – Hards, like Vega and Munoz, was not a casual bystander, but a victim fearing for her life.  Thus, she would be expected to have been paying acute attention to the perpetrators and events occurring around her.

49

**Accuracy of Prior Description** – There is no indication that Hards provided anything beyond a general physical description of the perpetrators that could be verified against Petitioner's appearance.

**Level of Certainty** – Although Hards hesitated while viewing the full photos, once she used the cards to focus her view on the parts of the perpetrators' faces she observed, she was certain in her identification, identifying Petitioner by saying "those look like the eyes that I - - that I seen." (Exhibit I, R.T. 1/6/09 at 132; Exhibit K, R.T. 1/7/09 at 113-114.) She told Detective Cordova that she was "really sure, pretty sure" that Petitioner's photo was the perpetrator (Exhibit K, R.T. 1/7/09 at 105-106), and that she was comfortable saying that it was the person hold the gun in her house (*id.* at 115). Hards likewise was confident in her identification of Petitioner in the courtroom. (Exhibit I, R.T. 1/6/09 at 132-133.)

**Elapsed Time** – Less than 12 hours elapsed between the crime and the photo lineup. (*See* Exhibit K, R.T. 1/7/09 at 108-109.)

**Analysis of Evidentiary Challenge** – As discussed above, there is nothing about the photo lineup which was unduly suggestive. The reliability of the identification is enhanced by the degree of attention, level of certainty and limited elapsed time. The reliability is reduced by Hards' limited opportunity to view the perpetrator and the lack of a matching prior description. The detraction resulting from the limited opportunity to view is minimized by the fact that Hards based her identification on the limited portion of the perpetrator that she was able to view.

In sum, the undersigned does not find that under the circumstances the photo lineup was so suggestive as to "give rise to a very substantial likelihood of irreparable misidentification." *Kessler*, 692 F.2d at 585.

**Analysis of Trial Counsel** – Short of the physical evidence found in the car, and the observed behavior of Petitioner and his girlfriend following the crimes, Hards offered what was arguably the most damning testimony. Munoz provided only hesitant identifications. Vega was certain in her identifications, but that identification was

subjected to significant attack based upon the suggestiveness of the show-up identification.  Hards, on the other hand, with no prior connection to Petitioner, picked him out of an array of photos.  Thus, the exclusion of Hards testimony could have created a reasonable probability of a different outcome, indicating prejudice from counsel's failure to pursue the claim.

That presumes, of course, that counsel would have been successful in excluding Hards' identification. While the undersigned would have found sufficient reliability to admit the evidence, reasonable jurists might have reached a different conclusion.  Hards' lack of a prior description and limited opportunity to view the perpetrator are significant indicators of a lack of reliability.  However, the failure to establish that the procedure was unduly suggestive precludes a finding that the claim of ineffective assistance of trial counsel was substantial.

**Analysis of PCR Counsel** – Given the undersigned's view of the lack of merit in the underlying claim, even if the claim concerning trial counsel had some merit, the undersigned cannot say that PCR counsel was not acting within the wide range of reasonable counsel in failing to pursue the claim.

Consequently, the undersigned cannot find that Petitioner received ineffective assistance of PCR counsel, and thus Petitioner has not shown cause for his failure to exhaust this claim.

### (2) Failure to Challenge In-Court Identification

Next, Petitioner argues that PCR counsel was ineffective for failing to raise a claim that trial counsel was ineffective in failing to challenge the in-court identifications. Apart from the derivative challenges based on the suggestiveness of the pretrial identifications (discussed hereinabove), Petitioner points only to trial counsel's failure to retain an expert to testify about the lack of reliability in eyewitness identifications.

Petitioner raises concerns about the witnesses' lack of opportunity to view the victims, the suggestiveness of the identification procedures, the stressfulness of the

situation, "weapons focus," etc.  (Petition, Doc. 1 at 9-11.)  Petitioner points to the research available on the effects of such matters on the reliability of eyewitness identifications, and argues that trial counsel's failure to call an expert left such research unused.

At the outset, the undersigned notes that Petitioner fails to proffer any particular expert's testimony.  A petitioner may not simply speculate about what a witness' testimony might be, but must adduce evidence to show what it would have been.  *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997).  "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *U.S. v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991).

Petitioner does, at least, provide generalities of the kinds of expert testimony which he contends could have been obtained.   The undersigned presumes, for purposes of this Report and Recommendation, that such testimony would have indeed been available.

**Analysis of Trial Counsel**- Plaintiff must show both deficient performance and prejudice on the part of trial counsel in failing to call such an expert.

The value of such expert testimony has been recognized by the Sixth Circuit. "We agree with the district court that 'other means' of attacking eyewitness identifications [*e.g.* cross-examination] do not effectively substitute for expert testimony on their inherent unreliability." *Forensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007).  Arizona has similarly, long recognized the value and admissibility of such expert testimony.  *See State v. Chapple*, 137 Ariz. 281, 770 P.2d 1208 (1983).   However, Arizona has also limited the requirement that trial courts admit such testimony to cases decided "solely on unusual, delayed, ambiguous eyewitness identification," and have authorized trial courts to refuse it in cases, not unlike the instant one, where "there was prompt, positive, unambiguous eyewitness identification supported by considerable other physical

52

1    evidence tying defendant to the crime." *State v. McCutcheon*, 162 Ariz. 54, 58, 781 P.2d

2    31, 35 (1989).

3         Even assuming that the evidence would have been found admissible in this case,

4    that does not mean that trial counsel was ineffective for failing to offer it.

5         In addressing the deficient performance prong of the *Strickland* standard, the Fifth

6    Circuit has found "specious" an argument that counsel is *required* to use such testimony

7    in order to provide effective assistance. *Cantu v. Collins*, 967 F.2d 1006, 1016 (5th Cir.

8    1992).   The court observed:

9              While petitioner is correct that the admission of expert testimony
              regarding eyewitness identifications is proper, he cites no authority
10             to support the theory that his trial counsel was required to call an
              expert witness to challenge Moreno's testimony. Indeed, Cantu's
11             trial counsel testified at the evidentiary hearing that he considered
              seeking the services of an expert witness on the issue of eye-witness
12             identification but decided against it based on his belief that his
              cross-examination of Moreno would be sufficient to refute the
13             accuracy of the identification.

14   967 F.2d at 1016.  While here there is no evidence that Petitioner's trial counsel actually

15   made a strategic decision to not call an eyewitness expert, this Court need not determine

16   the actual reason for an attorney's actions, as long as the act falls within the range of

17   reasonable representation.   *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991),

18   cert. denied, 113 S. Ct. 96 (1992).  Here counsel engaged in extensive cross-examination

19   of the eyewitnesses, which if not successful, was at least effective in high-lighting the

20   kinds of concerns that an expert would have relied upon in attacking the credibility of the

21   eyewitnesses, e.g. their limited opportunity to view the perpetrators both as to the time

22   viewed and the constraints of their disguises, the hesitations of the witnesses, etc.

23         Even if this Court were to conclude, in hindsight, that in cases such as this, with

24   disputed eyewitness identifications, counsel ought to be required to retain an expert to

25   testify on eyewitness identifications, this Court cannot say that this was the practice in

26   place among reasonable attorneys at the time of Petitioner's trial.   Accordingly, this

27   Court cannot find that counsel's failure to retain such an expert was outside the wide

28   range of professionally competent assistance, *Strickland*, 466 U.S. at 687-90, as judged

from counsel's perspective at the time of the alleged error. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

"Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689.

The Ninth Circuit has similarly declined to create a requirement for eyewitness identification experts, but has done so from the prejudice prong. In *Howard v. Clark*, 608 F.3d 563 (9th Cir. 2010), the Court observed that it has repeatedly rejected efforts to insert such experts into federal criminal trials:

> We have repeatedly affirmed district court decisions to exclude the testimony of eyewitness-identification experts from federal criminal trials. In reaching these decisions, we have made it clear that we "adhere to the position that skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable."

608 F.3d at 573-74 (citations omitted). The court concluded: "If federal defendants are not prejudiced by the exclusion of testimony from eyewitness-identification experts, [the state prisoner] was not prejudiced by his trial attorney's failure to call such an expert, especially on this record." The record in *Howard* was even less substantial than the present case. It reflected a conviction for a shooting, based solely upon eyewitness identifications by one witness who was certain of his identifications both in a photo-lineup and at trial, and another witness who disputed whether she made a positive identification in the photo-lineup and asserted at trial that the defendant was not the shooter.

Despite the strong federal case law against a mandate that counsel use eyewitness identification expert testimony, and despite the limits of Arizona's embrace of such evidence, the undersigned cannot say that a claim of ineffective assistance based on counsel's failure to offers such testimony was wholly without merit.

**Analysis of PCR Counsel** – The undersigned is convinced, however, that PCR

counsel was not ineffective in failing to raise the claim.   The admissibility of the evidence in a case such as this is less than clear.   The requirement that trial counsel offer it even less so.   And, given the cross-examination of the eyewitnesses provided to the jury, and the physical evidence tying Petitioner to the crime, the undersigned cannot find a likelihood that the outcome of the trial would have been different.

Therefore, the undersigned must conclude that Petitioner has failed to show ineffective assistance of PCR counsel, and thus has failed to excuse his procedural default of his claim of ineffective assistance of trial counsel.

### (3) Failure to Challenge Seizure of Wallet

Finally, Petitioner asserts that PCR counsel was ineffective for failing to argue that trial counsel was ineffective in failing to seek to exclude evidence arising from the seizure of the victim's wallet from Petitioner's car.   Petitioner argues that there were no exigent circumstances which justified the seizure of the wallet without a search warrant. (Petition, Doc. 1 at 11-12.)

Respondents argue that Petitioner fails to provide authority for his argument that Petitioner's girlfriend could not be prevented from taken stolen property that was in the officer's plain sight.   Respondents further argue that the seizure of the wallet was permissible under the automobile exception to the warrant requirement, which permits a search of a vehicle if there is probable cause to belief it contains evidence of a crime.

The Supreme Court has long held that a warrantless search of an automobile is not unreasonable, so long as it is supported by probable cause to believe the vehicle contains contraband or evidence of a crime.   *California v. Acevedo*, 500 U.S. 565 (1991). "Probable cause to search exists when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found."   *U.S. v. Ibarra*, 345 F.3d 711, 716 (9th Cir. 2003).

Here, the wallet was seized by Sergeant Montoya.   Prior to seizing the wallet, Montoya had been informed that a victim at the second robbery had reported a belief that

one of the perpetrators hung around the house where Petitioner's car was parked. (Exhibit K, R.T. 1/7/09 at 84-85.)  Moreover, the car matched the description provided to Montoya of the perpetrator's vehicle from the first robbery, and appeared unusual because its windows were left down, something unusual in the neighborhood at that time of night. (*Id.* at 86-87.)   Finally, Montoya observed a brown wallet lying on the center console which matched the description of the wallet taken from the first robbery." (*Id.* at 87.)   Montoya testified that he "he thought it was a possibility that that wallet could be the wallet that was taken in the earlier home invasion." (*Id.* at 89.)

Here, the tripartite knowledge of the location of the vehicle in relation to the perpetrator's common location, the use of a similarly described vehicle in the crime, and the visible wallet matching the stolen goods in an unsecured vehicle, would warrant a reasonable person to conclude that the wallet was evidence of a crime, and thus that the vehicle contained such evidence.

Petitioner argues that under the circumstances there were, nonetheless, no exigent circumstances to search the vehicle or seize the wallet.  Petitioner indicates he was, at the time, "not at liberty to retrieve the wallet" and neither he nor anyone else was able to transport the vehicle away.  (Petition, Doc. 1 at 12.)  However, in *Arizona v. Grant*, the Supreme Court clarified that access to the vehicle is a requirement only when the search is "incident to a recent occupant's arrest."   556 U.S. 332, 343 (2009).   The Court recognized the separate situation where "it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"  *Id.* at 343 (citations omitted).  The Court found the search in *Grant* unreasonable only because "[n]either the possibility of access nor the likelihood of discovering offense-related evidence authorized the search." *Id.* at 344.  Further, the Court further acknowledged the separate exception authorizing a warrantless search "if there is probable cause to believe a vehicle contains evidence of criminal activity." *Id.* at 347.

Because here there was probable cause for Sergeant Montoya to believe that the car contained evidence of criminal activity, no exigent circumstances needed to be

shown.

**Analysis of Counsel** – Because the undersigned concludes that the underlying evidentiary claim is wholly without merit, the undersigned cannot find any merit to the suggestion that trial counsel was ineffective.

Even if the undersigned could find some glimmer of hope in the evidentiary argument, the authorities cited above would make entirely reasonable a tactical decision by PCR counsel not to assert the claim.  Therefore, the undersigned finds no merit to the contention that PCR counsel was ineffective in failing to raise a claim based on trial counsel's failure to assert this claim.

Therefore, Petitioner has failed to excuse his procedural default on this claim.

**4. Prejudice**

Although both "cause" and "prejudice" must be shown to excuse a procedural default, a court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).  Petitioner has filed to establish cause for his procedural default.

Nonetheless, for the reasons stated herein above, even if Petitioner could show cause to excuse his procedural defaults, the undersigned could not find prejudice from the claimed ineffective assistance of trial counsel.

**5. Actual Innocence**

The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances, to avoid a "miscarriage of justice." *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986).  Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).  Although

57

not explicitly limited to actual innocence claims, the Supreme Court has not yet recognized a "miscarriage of justice" exception to exhaustion outside of actual innocence. *See* Hertz & Lieberman, *Federal Habeas Corpus Pract. & Proc*., §26.4 at 1229, n. 6 (4th ed. 2002 Cumm. Supp.).  The Ninth Circuit has expressly limited it to claims of actual innocence. *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008).

Petitioner makes no claim of his actual innocence, and the undersigned finds no basis to conclude that Petitioner was actually innocent.

**6.  Summary re Exhaustion**

Petitioner has procedurally defaulted on his claims or they have been procedurally barred on independent and adequate state grounds.  He has failed to show cause, whether because of his *pro se* status or the ineffectiveness of PCR counsel to excuse his procedural failures, and has failed to show prejudice from any alleged constitutional violations.  Petitioner has not asserted nor shown his actual innocence.

Therefore, even if deemed timely, Petitioner's claims must be dismissed with prejudice as procedurally defaulted and/or procedurally barred.

**C.  SUMMARY**

Petitioner has failed to show adequate statutory tolling, and therefore his Petition is delinquent.  He has failed to show exceptional circumstances to entitle him to equitable tolling, and has not shown actual innocence to avoid the effect of his delinquency.  Accordingly, his petition must be dismissed with prejudice as barred by the habeas statute of limitations.

Alternatively, Petitioner has either procedurally defaulted his state remedies on the claims he raises, or they are were procedurally barred on an independent and adequate state ground.    Petitioner has failed to show cause, prejudice, or actual innocence to avoid the effect of his default.  For this reason also his petition must be dismissed with prejudice.

## IV.  CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find debatable whether the district court was correct in its procedural ruling." *Id.*

 **Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on procedural grounds.  The undersigned finds that reasonable jurists could find debatable or wrong those portions of the ruling relating to statutory tolling of the habeas statute of limitations during the expiration of

the time for un-sought, subsequent state review of post-conviction proceedings.

However, a debate over the procedural ruling is insufficient to justify a certificate of appealability. Rather, a substantial showing of a valid claim of the denial of a constitutional right must also be shown, that is that “reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner.” *Slack*, 529 U.S. at 484.

Here, under the reasoning set forth herein, the undersigned has concluded that the underlying constitutional claims are without merit. The undersigned further finds that jurists of reason could not find differently on the merits of the claims.

Accordingly, the undersigned finds that a certificate of appealability should not issue.

## V. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed November 1, 2012 (Doc. 1) be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that, to the extent the reasoning of this Report and Recommendation is accepted, a Certificate of Appealability be **DENIED**.

## VI. EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See also* Rule 8(b), Rules Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any

findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues, *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*), and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: June 19, 2013

_____
James F. Metcalf
United States Magistrate Judge

12-2350r RR 13 04 19 on HC Final.docx